Laramore, Judge,
delivered the opinion of the court:
This is a suit to recover damages for the alleged breach of a contract between plaintiff and the Bureau of Yards and *70 Docks of the Navy Department. The contract was for the construction of a quay wall, piers, and mooring platforms at the San Francisco Naval Shipyard.
Plaintiff’s bid of $4,251,198 was accepted by letter dated June 25, 1946, and by the same letter defendant directed plaintiff to proceed with the work. A formal contract dated June 27,1946, was thereafter executed. It provided that the work was to be completed within 430 calendar days after receipt by the contractor of the notice to proceed. The notice to proceed was received on June 27,1946, which made August 31, 1947, the completion date. For late completion, not excusable under the contract terms, liquidated damages of $1,500 per calendar day were agreed to. Such liquidated damages, which were unusually high for a Navy Department contract at that time were not assessed against plaintiff.
At the time of the defendant’s issuance and the plaintiff’s receipt of the notice to proceed, plaintiff could not proceed with the work because the site was not available, and because the defendant had not furnished certain steel sheet piles required for performance.
The contract provided that the Government would excavate, under another contract, the trenches for the quay wall and piers and place the sand blankets therein. Under this other contract, the entire site of plaintiff’s work was also to be dredged.
Plaintiff, as a joint venturer with another contractor, submitted a bid on the dredging specifications, but the bid was not accepted. The dredging contract, dated June 25, 1946, was awarded to a joint venture, Case-American Construction Company, a well-known contractor which had previously performed numerous dredging contracts for the defendant.
Notice of award and notice to proceed with the work on the dredging contract were issued by defendant on June 24, 1946, and received by Case-American on June 25,1946, which was the day of the opening of bids on plaintiff’s contract and issuance of notice of award and notice to proceed to plaintiff. Two days later plaintiff received defendant’s notice to proceed.
In preparing its bid on its contract, plaintiff did not assume that all of the work under the dredging contract *71 would have to be completed before construction of the quay wall and piers could commence. To enable plaintiff to begin work, it was necessary that the dredging work be completed in the area from the shoreline past the quay wall site to about one-fourth of the inboard ends of the two piers, with the necessary trenches for the quay walls and two piers excavated and sandfilled in that area. Plaintiff reasonably assumed that priority would be given to that part of the dredging work. The dredging and sandfilling of trenches on the remaining area of plaintiff’s site did not have to be completed before plaintiff could commence its work, and the dredging in that area and in the approach area outboard of plaintiff’s work could be performed simultaneously with plaintiff’s work without interference between the two operations. Plaintiff assumed that the defendant would require that the dredging work be completed, first at the site of the quay wall and the inboard ends of the piers and that it would be able to commence its work by approximately October 1, 1946.
Sufficient site for plaintiff to commence work did not become available until January 20, 1947, when the site of Pier No. 2 instead of Pier No. 1 became available. The entire site of plaintiff’s work became available on February 15, 1947. The dredging contract was completed on February 17,1947,87 calendar days after the specified completion date.
During the performance of the dredging contract, defendant’s Officer in Charge frequently met with Case-American’s superintendent and orally expressed dissatisfaction with the rate of progress of the dredging work. He repeatedly urged that Case-American employ more equipment. However, he did not order that more equipment be added because he believed that the defendant’s agents had no right under the contract to direct the method of accomplishing the contract, but were limited to the sanctions provided by the contract, which were assessing liquidated damages of $400 per day of delay, or terminating the contract for default.
Defendant’s Officer in Charge did not recommend termination of the dredging contract to his Contracting Officer on account of Case-American’s delays in performance be *72 cause it was Ms belief that such procedures would cause even greater delay in completion due to the necessity of surveying the uncompleted job and preparing specifications for and reletting another contract for the work.
The performance of the dredging contract having been delayed 87 calendar days beyond the date provided for completion, Case-American requested extensions of time totaling 85.23 calendar days. The total of the time extensions recommended by defendant’s Officer in Charge amounted to 45 calendar days.
On April 1, 1947, defendant’s Contracting Officer concurred in the recommendations of the Officer in Charge, and accordingly a change order was issued to Case-American by the defendant, which extended the contract completion time by 45 calendar days to J anuary 6,1947.
Liquidated damages for the remaining 42 days of delay in completing the dredging contract were assessed against Case-American in the sum of $16,800 at the contract rate of $400 per day.
As provided in plaintiff’s contract and specifications, the defendant was to furnish all the steel sheet piles required for constructing the quay wall. These piles were not furnished on time, and when they were delivered, it was not in the order in which they were needed for use on the project.
Independently of the delay due to unavailability of the site, the commencement of the construction of the quay wall was delayed 154 calendar days after January 20, 1947, the date when the site first became available, and until June 24, 1947, when defendant first supplied sufficient piles necessary for commencement of that operation.
The contract performance time of 430 calendar days, if extended from January 20, 1947, would have required completion of all work by March 25,1948. Pursuant to plaintiff’s letter request of J anuary 28,1947, repeated on September 4, 1947, defendant’s Officer in Charge recommended on September 19,1947, that due to unavailability of the site, plaintiff’s contract performance time be extended by 207 calendar days, being the entire period from June 27,1946, the date of plaintiff’s receipt of notice to proceed, to January 20, 1947. On the basis of Ms recommendation, the contract completion *73 date would have been extended to March. 25,1948. Defendant’s Contracting Officer, however, reduced the 207 days by the 10 days considered to be necessary for assembly of labor and equipment, which preparatory time it was concluded plaintiff had had prior to availability of the site. Defendant on December 4, 1947, issued, and plaintiff accepted, a contract change order, by which plaintiff’s performance time was extended on account of unavailability of the site by 197 calendar days to March 15,1948.
The piers and mooring platforms were substantially completed by that date. The delayed delivery of piles, however, prevented completion of the driving of the quay wall until October 29,1947, and the sand backfilling in and behind the quay wall until February 10, 1948, despite diligent operations by the plaintiff. It was then impossible to complete installation of the required facilities in and behind the quay wall by March 15, 1948, the contract completion time as extended on account of unavailability of the site.
By change order dated July 3, 1947, defendant required substantial additional work on the pumping plant to be located, pursuant to the contract, in the sand fill areas behind the quay wall. The agreed price of this change was $195,900, which was added to the contract price.
The work upon and behind the quay wall, as well as on the project as a whole, was substantially completed by June 15, 1948'. The exceptions concerned installation of some electrical equipment and corrections of defects in portions of the work. Defendant subsequently accepted the project work as substantially completed on June 15, 1948, with minor exceptions.
Pursuant to plaintiff’s letter request dated June 24, 1947, repeated by its letter dated September 4, 1947, defendant’s Officer in Charge on January 12, 1948, recommended to defendant’s Contracting Officer that plaintiff’s contract performance be further extended an additional 154 calendar days, or to August 16,1948, because of defendant’s delays in furnishing steel sheet piles for the quay wall. This proposed extension was in addition to that of 197 calendar days previously allowed for unavailability of the site, which extended the contract completion date to March 15, 1948. On *74 January 28, 1948, defendant’s Officer in Charge further advised the Contracting Officer that the contract completion date would be determined by delivery of electric motors for salt water pumps, and that the contract performance should be completed by June 15, 1948, which was 92 calendar days after March 15, 1948.
By change order dated April 16, 1948, the defendamos Contracting Officer found that due to the defendamos delay in furnishing the steel sheet piles, the progress of the plaintiff's work was delayed 92 calendar days, and accordingly extended the contract time for completion by that number of days to and including June 15,1948.
By letter dated August 4, 1948, defendant accepted the work under plaintiff’s contract as complete as of June 15, 1948, except for the installation of two pump motors for the pumphouse, two minor items of corrective work, and certain Burndy mole installations. This remaining work, except for the Burndy moles, required a maximum of three days for performance.
The two motors for the pumphouse were eventually delivered and installed. By change order dated November 16, 1948, defendant’s Contracting Officer found that due to delays in procurement beyond the plaintiff’s control, the progress of the work on the subject contract had been delayed 126 calendar days, and accordingly extended the contract completion date to and including October 19, 1948.
Ultimately plaintiff received and installed the replacement Burndy moles, and after another series of tests, the defendant accepted the contract work as complete as of May 6,1949. By change order dated June 13,1949, defendant’s Contracting Officer directed that the contract completion date be further extended by 199 calendar days to and including May 6,1949.
Plaintiff’s claim for additional costs resulting from delays in furnishing the site and the necessary steel sheet piles was from time to time the subject matter of correspondence and conferences between the parties. Thereafter by speedletter dated October 9,1947, the defendant’s Contracting Officer advised defendant’s Officer in Charge that under well-established rules of law plaintiff’s claim for damages *75 for delays could not be administratively considered, but was within the exclusive purview of the Court of Claims, and that the contractor should be advised that this was a final decision of the Contracting Officer. By letter dated October 20, 1947, defendant’s Officer in Charge transmitted this information to plaintiff and advised that it constituted a final decision. By letter to the Contracting Officer dated November 5, 1947, plaintiff reviewed in detail the facts concerning its claim and requested reconsideration of the decision of October 20, 1947. In order to comply with the contract requirement that an appeal be taken from a final decision of the Contracting Officer within thirty days, plaintiff also appealed to the Secretary of the Navy by two letters, each dated November 18, 1947, covering respectively the claim for delay in availability of the site and the delay in furnishing steel sheet piles. By letter dated December 2, 1947, defendant’s Contracting Officer replied to plaintiff’s request for reconsideration, and stated that his decision must remain the same since plaintiff’s claims were for unliquidated damages, settlement of which was beyond his authority. He also stated that this was his final decision under Article 16 of the contract. By letter to the Secretary of the Navy dated December 30, 1947, plaintiff appealed from this last decision of the Contracting Officer.
The appeals were docketed before the Navy Board of Contract Appeals, the authorized representative of the Secretary of the Navy. Counsel for Yards and Docks then moved to dismiss the appeals because they were claims for unliquidated damages, beyond the jurisdiction of the Board. By its written decision dated November 28, 1949, the Board sustained the motion in part and dismissed plaintiff’s appeals to the extent that they concerned claims for damages for delays in availability of site and furnishing by the defendant of steel sheet piles. The Board otherwise overruled the motion as it concerned plaintiff’s allegations that defendant had directed plaintiff to accelerate the work after the delays had ended. Thereafter, a hearing was held before the Board on the limited issue, and by written decision dated July 3, 1952, the Board stated that the defendant had not ordered the acceleration of the performance of plaintiff’s *76 contract, and plaintiff’s appeals were accordingly denied. Plaintiff’s claim as presented to this court does not include the administrative claim for additional costs for the alleged acceleration of the wort. ■ It is based on damages allegedly sustained as a result of delays in (1) mating the worksite available, and (2) furnishing the steel piles.
The facts set out above are, we think, sufficient to an understanding of the case. As found by a commissioner of this court, they are much more detailed, and have been extensively excepted to by both parties. We have carefully considered each exception in light of the evidence adduced at trial, and adopt the commissioner’s findings. No useful purpose could be served by discussing each exception in detail.
Respecting the first basis of plaintiff’s claim, the alleged delay in making the worksite available, we conclude that the delay was caused by the failure of the dredging contractor to complete its work on schedule, and thereby allow plaintiff to begin performance under its contract on the contemplated date.
Plaintiff contends that the contract contained an implied obligation that defendant would affirmatively cooperate to make possible the performance of the work within the contract time, and would not through lack of diligence or negligence delay the work, or render its performance more expensive. While this is true, we cannot concur in the plaintiff’s position that defendant’s Officer in Charge was negligent in his administration of the dredging contract. Plaintiff states repeatedly that the Officer in Charge should have ordered the dredging contractor to do this or do that. The Officer in Charge could not order the dredging contractor to do anything. Pie could make suggestions, and in an attempt to have them heeded threaten to recommend invocation of the contract sanctions, namely, assessing liquidated damages, or terminating, the contract for default. Liquidated damages were assessed. Termination for default was not recommended because the Officer in Charge believed that such action would cause even greater delay in completion due to the necessity of surveying the uncompleted job and preparing *77 specifications for and reletting another contract for the dredging work. This was a reasonable determination.
The delay in availability of the site of plaintiff’s work resulted from the delays by the dredging contractor in the performance of the dredging contract. It follows that if the defendant was not at fault, it is not liable in damages for the delays caused by another contractor. Standard Accident Insurance Go. v. United States, 102 Ct. Cl. 770, 790, cert. denied 825 U.S. 870. Furthermore, unless the Government expressly covenants to make the site available at a particular time, plaintiff has the burden of proving that the United States was in some way at fault because the site did not become available to it at an earlier date. United Stotes v. Foley Co., 829 U.S. 64. Since plaintiff has failed to prove fault or negligence on the part of the United States, his claim, in this respect, must fail.
The second basis for plaintiff’s claim is that the Government was negligent in fulfilling its obligation to furnish the steel sheet piles for the quay wall when reasonably needed for the performance of the contract.
As provided in the contract and specifications, the defendant was to furnish all the steel sheet piles required for the construction of the quay wall. Plaintiff reasonably intended to start driving the piles for the quay wall at the outset of its operations, as the driving of the piles had to precede the remainder of the work.
The defendant contends that the delays in delivery of the steel sheet piles to plaintiff were not its fault, because it was not negligent in its efforts to procure the piles, and because at the time involved, steel was difficult to obtain. In this respect, defendant says it negotiated with the Carnegie-Illinois Steel Corp. for two months before agreement for the procurement of steel was reached. The negotiations were so protracted because Oarnegie-Illinois demanded a price readjustment clause, and the defendant felt that the provisions of 34 Stat. 49 prevented an open-end price clause for the reason that it would be impossible to determine in advance whether contractual obligations would exceed budgetary and appropriation limitations. However, when the defendant finally did contract for the steel sheet piles, it was on practically the same *78 contractual basis as originally demanded by Carnegie-Illinois and refused by the Government.
At numerous conferences, and by many letters, inquiry was made by plaintiff as to when the steel sheet piles would be delivered. Both parties understood plaintiff needed the piles as soon as possible. Each time plaintiff was informed by defendant that no difficulty would be encountered in the procurement of the steel. Plaintiff even suggested that it be allowed to order steel itself if any difficulty in procurement was anticipated. Never was a sufficient amount of steel piling delivered to plaintiff so as to permit construction completion without delay. Although the defendant well knew from the contract drawings and specifications that the special piles were needed for the commencement and continued progress of construction of the quay wall, defendant failed to exercise reasonable diligence to provide the piles in the order in which they would be required for use on the project.
Defendant cites the case of Barling v. United States, 126 Ct. Cl. 34, to support its contention that it was not negligent in procuring the steel piles. However, as we indicated in Barling; Otis Williams & Company v. United States, 120 Ct. Cl. 249; and Thompson v. United States, 130 Ct. Cl. 1, each one of these cases turns on its own facts, since the question to be answered is whether or not the Government was negligent or at fault in providing supplies to the contractor that the contract called for it to so provide.
From all of the evidence in this case we find that the defendant was negligent and lacking in reasonable diligence in fulfilling its obligation to furnish the steel sheet piles for the quay wall when reasonably needed in the performance of the contract, and that as a result of such negligence and lack of deligence, plaintiff was delayed in its over-all performance of the contract to the extent of 92 calendar days.
In his findings of fact which we adopt as the findings of the court, the commissioner has found that plaintiff’s increased costs caused by the defendant’s actionable delay in furnishing steel sheet piles was $71,149.28, broken down as follows:
*79 Field Office Salaries_$23,673.44
Other Field Office Overhead_ 2, 573.24
Equipment Ownership Expense_ 2, 643. 81
Equipment Ownership Expense_ 4, 980. 95
Wage Increases_ 3,268.31
General Overhead Expense_ 28,453. 76
Installation of Special Pile_ 873.60
Prevention of teredo damages_ 4,682.17
Total Increased Costs_$71,149.28
In addition, plaintiff will be obligated to pay an additional amount of one percent for bond premium, or $711.49, which percentage must be paid to plaintiff’s bonding company on any amount recovered on plaintiff’s claim. Including such additional bond premium, the total of plaintiff’s additional costs is $71,860.77.
We see no reason for repeating here the facts and formu-lae upon which the commissioner reached the ultimate finding of $71,149.28 in increased costs. They are set out in findings 70 through 77.
Damages in the amount of $71,860.77 were sustained as a result of defendant’s breach, and judgment in that amount will be entered for plaintiff.
It is so ordered.
Durfee, Judge; MaddbN, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a California corporation with its principal office at San Francisco. Since its incorporation on February 26,1926, plaintiff has been engaged principally in heavy waterfront construction, having performed contracts for such work priced in excess of 150 million dollars. Its founding president had been engaged in such work for 20 years prior to the incorporation.
2. On May 28,1946, the Chief of the Bureau of Yards and Docks, Navy Department, issued Navdocks Specification No. *80 17852 for construction of a quay wall, piers, and mooring platforms at the Naval Shipyard, San Francisco, California. It was provided that bids on this work would be opened on June 18, 1946, at the shipyard. Six addenda to the specifications were issued prior to bidding, and the third and fourth addenda successively postponed the date for opening of bids to June 20 and then to June 25,1946.
Plaintiff submitted its bid for the work in the amount of $4,251,198. As required by the specifications, plaintiff furnished with its bid a list of equipment which it proposed to use on the project. By letter dated June 25,1946, defendant notified plaintiff of its acceptance of plaintiff’s bid and directed plaintiff to proceed with the work. Thereafter formal contract NOy-13734, dated June 27, 1946, was executed by plaintiff and by defendant, acting through the Chief of the Bureau of Yards and Docks, Navy Department.
3. As stated in the specifications, the work in its entirety was to be completed within 430 calendar days after receipt by plaintiff of defendant’s notice to proceed. Such notice was received by plaintiff on June 27,1946, and accordingly, August 31, 1947, was established as the completion date. The formal contract expressly provided that the work be completed on or before August 31,1947.
Both the specifications and the formal contract provided that liquidated damages would be assessed by the defendant against the plaintiff at the rate of $1,500 per calendar day for delays in performance beyond the time specified for completion. Excusable delays were provided for in the following language in Article 11 of the contract:
* * * It is agreed, however, that the Contractor shall not be charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government .or any state or political sub-division thereof (including, but not restricted to the operation of any Governmental preferences, priorities or allocations of equipment or material) acts of another Contractor in the performance of a contract with the Government, fires, floods, explosions, earthquakes, or other catastrophes, epidemics, quarantine restrictions, strikes, *81 freight embargoes, unusually severe weather, or delays of subcontractors or material suppliers due to such causes (unless the Contracting Officer shall have ordered the Contractor to procure such work or material from other sources), if the Contractor shall within 10 days from the beginning of any such delay, or such longer period as may be allowed by the Contracting Officer, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work or any part thereof when in his judgment the findings of fact justify such an extension. The decision of the Contracting Officer thereon shall be final, subject only to appeal under Article 16.
At the time of the defendant’s issuance and the plaintiff’s receipt of the notice to proceed, plaintiff could not proceed with the work because the site was not available, and because the defendant had not furnished the steel sheet piles required for performance. The Navy Department was in urgent need of the piers and mooring platforms to be constructed under the contract, to be used for berthing part of the Navy’s inactive fleet. The provision of liquidated damages of $1,500 per calendar day was unusually high for a Navy Department contract at that time.
4. Pursuant to the contract, plaintiff agreed for its bid price to furnish all materials except the steel sheet piles and perform all work necessary for the construction of a quay wall, two piers, six mooring platforms, a trestle, and various mechanical and electrical services.
The quay wall was to be constructed of interlocking steel sheet piles driven offshore in such a manner as to create 52 successive cells to be filled with sand to form a continuous bulkhead. The water area between the shore and the quay wall was to be filled with sand. Extensive mechanical and electrical facilities were to be installed in the sandfill in the cells of the quay wal'1 and also in the fill behind the wall.
Extending outboard from the water side of the quay wall, there were to be constructed two piers, each to be 1,200 feet in length. The inboard one-third of each pier was to be supported on concrete-jacketed timber piles known as gunite piles. The outboard two-thirds of each pier was to be founded on composite piles which are timber piles driven to *82 water level; to the top of each is attached a concrete pile by means of a steel pipe. Following the driving and girting of piles for the piers, a concrete deck for each pier was to be constructed with mechanical and electrical facilities, and also to be installed were bollards to moor ships and fender piles to protect the pier.
Six mooring platforms were to be constructed with reinforced concrete decks supported by steel H piles. A trestle with a concrete deck supported by gunite and composite piles was to be built from the end of the quay wall to the first mooring platform and thereafter between the successive platforms.
The mechanical and electrical services to be provided for the two piers and the mooring platforms included lines for salt and fresh water, steam, and fuel oil, and also facilities for communication and electric power supply, in addition to the shore facilities to be installed in and behind the quay wall.
5. Articles 2, 4(e) and 16 of the contract provided as follows:
ARTICLE 2. — GOVERNMENT REPRESENTATIVES
(a) The work will be under the general direction of the Chief of the Bureau of Yards and Docks, hereinafter referred to as the “Contracting Officer.”
(b) The Contracting Officer shall designate an officer of the Civil Engineer Corps, United States Navy, or other officer or representative of the Government, as Officer in Charge of Construction, hereinafter referred to as the “Officer in Charge”, who shall, under the direction of the Contracting Officer, have complete charge of the work, and shall exercise full supervision and general direction of the work, so far as it affects the interest of the Government.
(c) The provisions in this article or elsewhere in this contract regarding supervision, approval or direction by the Contracting Officer or the Officer in Charge or action taken pursuant thereto are not intended to and shall not relieve the Contractor of responsibility for the accomplishment of the work either as regards sufficiency or the time of performance except as expressly otherwise provided herein.
(d) The terms “Secretary of the Navy”, “Chief of the Bureau of Yards and Docks”, “Contracting Officer” *83 and “Officer in Charge” include their respective successors and authorized representatives.
ARTICIiE 4. — PERFORMANCE OF THE WORK
* * * * *
(e) Space at Site. — The Contractor shall be allowed reasonable space at the site of the work and access thereto and shall confine his operations to the space assigned. The work shall be done without interference with the ordinary use of streets, berthing places, fairways and passages and the Contractor shall cooperate with other contractors of the Government and Government employees as may be required by the circumstances or directed by the Officer in Charge. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor or Government employees whether at the site or not.
ARTICLE 16. — DISPUTES
Except as otherwise specifically provided in this contract all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within 30 days to the Secretary of the Navy or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
6. The specifications, attached to and made a part of the contract, provided that the work would be located at the Naval Shipyard “approximately as shown” on the attached drawings, and it was stated that “the exact location will be indicated by the officer in charge.”
The specifications further provided that the interlocking steel sheet piles for the cellular quay wall were to be furnished by the defendant and driven by the plaintiff, and that such piles would be in one piece and of the lengths specified.
7. Addendum No. 3, dated June 11, 1946, to the above-mentioned specifications, provided in pertinent part as follows:
*84 Refer to Y&D drawing No. 481421 and add the following note:
The Government will excavate, under another contract, the trenches for the quaywall and piers, and will place the sand blankets therein to the following elevations:
(1) Quaywall elevation 55, plus or minus one foot;
(2) Piers 1 and 2 elevation 60, plus or minus one foot;
(3) Six mooring platforms elevation 70, plus or minus one foot.
Drawings showing the detail of the work to be performed by others are on file at Room 2110 of the Administration Building, and may be reviewed by the contractor.
These trenches, which were to be constructed under another contract, were to be 10 feet deep at the site of each pier and of the mooring platforms, and the trench for the quay wall was to be excavated to a firm material at a greater depth. All of the trenches were to be backfilled with sand to the elevations stated above, in order to form a firm foundation for the various structures.
The entire site of plaintiff’s work was to be dredged (also under the other contract) to a depth of 40 feet, except to 30 feet in the area of the mooring platforms. An extensive approach area beyond the outboard ends of the piers and outside of the site of plaintiff’s work was also to be dredged.
8. On May 22, 1946, 6 days prior to the issuance of the specifications on plaintiff’s contract, the Chief of the Bureau of Yards and Docks, Navy Department, issued Navdocks Specification No. 17851 for the dredging and trench excavation and sandfilling described in the preceding finding. Three addenda to this specification were issued by defendant prior to the opening of bids thereon. The second addendum set the opening of bids on June 12,1946,13 days prior to the opening of bids on the specifications on plaintiff’s contract.
Plaintiff, as a joint venturer with another contractor, submitted a bid on the dredging specifications, but the bid was not accepted. The dredging contract, numbered NOy-13733, dated June 25, 1946, was awarded to a joint venture, Case-American Construction Company, a well- *85 known contractor which had previously performed numerous dredging contracts for the defendant.
Notice of award and notice to proceed with the work on the dredging contract were issued by defendant on June 24, 1946, and received by Case-American on June 25,1946, which was the day of the opening of bids on plaintiff’s contract and issuance of notice of award and notice to proceed to plaintiff. Two days later plaintiff received defendant’s notice to proceed.
Defendant’s Officer in Charge testified as to the urgency of the project, but asserted that he issued notice of award and notice to proceed to plaintiff on June 25,1946, in order to establish contractual obligations prior to the end of the defendant’s fiscal year on June 30, 1946, and in order to afford plaintiff the earliest opportunity to place orders for material and equipment.
9. The work under the dredging contract encompassed three general categories, which were the removal and disposal of rocky fill, the hydraulic dredging and disposal of soft materials, and the excavation and placing of sandfill in the trenches for the quay wall, piers, and mooring platforms. The specifications for the dredging work originally required the removal of an estimated quantity of 310,000 cubic yards of rocky fill by dipper dredge, but these provisions were changed by addenda isued prior to bidding to require removal of 400,000 cubic yards of rocky fill by dipper dredge, or at the contractor’s option, by clamshell or dragline operation. The rocky fill consisted of material described as earth, rocks and boulders which had been removed from a hill on the Naval Shipyard under a previous contract and deposited along the shore line. This fill extended outward under the water from the shore line, covered the site of the proposed quay wall, as well as the intervening areas to be sandfilled, and extended outboard from the quay wall site to the extent that it covered the site of 2/7 of the inboard end of the proposed piers and part of the approach trestle to the first mooring platform.
The hydraulic dredging required by the dredging contract consisted of removal of an estimated 3,623,000 cubic yards of soft material described as chiefly bay mud with some sand *86 and clay. This material was to be dredged from the site of plaintiff’s proposed work and also from the extensive approach area adjacent thereto.
The sandfilling for the trenches of the future quay wall, piers, and mooring platforms was estimated to require 305,-000 cubic yards of material, which was obtained from the bottom of the bay about 6 miles from the project and deposited in place by use of a seagoing hopper dredge.
10. With respect to time of completion of the work and liquidated damages for delays in performance, the dredging specifications provided in paragraphs 1-06 and 1-07 as follows:
1-06. Time for completion. — The work based on the dredging and removal of 310,000 cubic yards of material by dipper dredge and 3,623,000 cubic yards by hydraulic dredge shall be completed within 150 calendar days after date of receipt of a notice of award, a letter of intent, or any other communication authorizing the contractor to proceed. However, in case the actual amount dredged and removed exceeds the quantities stated, the time for completion shall be increased one-calendar day for each 2,500 cubic yards of such excess dredged by dipper and each 30,000 cubic yards of such excess dredged hydraulically.
1-07. Damages for delay in accordance with article 11 of form no. 197 shall be at the rate of $400.00 per calendar-day for the entire work and $300.00 per calendar day if the work at the site of the future mooring islands is omitted.
Article 11 of the dredging contract, referred to in the above-quoted paragraph 1-07, provided for excusable delays in the same language as article 11 of the plaintiff’s contract, as quoted in finding 3. Addendum No. 3 to these specifications, issued prior to the opening of bids, changed paragraph 1-06, quoted above, by deleting the figure “310,000” and substituting in lieu thereof the figure “400,000.” Addendum No. 1 provided for optional use of clamshell or dragline operations in lieu of dipper dredging on the rocky fill, either in the work generally or to the extent that the removal of the rocky fill was a land operation.
11. Paragraph 2-05 of the dredging specifications set forth the defendant’s estimate of the quantities of material to be *87 removed by dredging, including side slopes but not including allowable overdepth. This paragraph further provided: “These quantities will be used only for the purpose of comparing bids, and the Government reserves the right to increase or decrease them by not more than 25 percent.” Paragraph 2-05 was also amended by addendum prior to bidding to show the increase in estimate of the rocky fill to be removed.
Paragraphs 2-03, 2-04, 4-01, 4-04, and 4 — 07, to be considered in connection with the addendum allowing optional use of clamshell or dragline operations in lieu of dipper dredging, provided as follows:
2-03. Character of material to be removed. — With the exception of the rocky fill shown at the shore end of the future piers and described hereinafter, the material to be removed by dredging is believed to consist chiefly of bay mud, with some sand and clay, that can be handled hydraulically. The rocky fill consists of earth, rocks and/or boulders overlaying the original mud. It has an average thickness of approximately 15 feet and a maximum thickness of approximately 25 feet. _ It shall be removed by dipper dredge. Dipper dredging shall also include the original material above elevation 90.0 to get flotation for the dredge. For bidding purposes the largest pieces shall be assumed as 6 feet in the largest dimension, and the dipper shall be adequate to handle such pieces. If larger pieces are encountered they shall be removed as specified hereinbefore under “artificial obstructions”.
2-04. Overdepth dredging. — In order to cover unavoidable inaccuracies of dredging processes, the contractor will be allowed a tolerance in dredged depth of not more than one foot above or below the indicated depth of bottom. The side slopes shall not be steeper than indicated, but will be allowed to assume their natural slopes. The contractor will be paid for material actually removed within these tolerances.
4-01. Order of work. — By reason of the extent of the areas to be dredged and filled, the quantities involved, and the importance of securing the completion of the work within the times specified hereinbefore, it is considered necessary that not less than one dipper dredge and two hydraulic dredges be employed. * * *
4 — 04. Depositing sand filling. — The placing of the sand filling shall follow the excavation therefor as closely as practicable in order to avoid excessive slough *88 ing and/or silting into the open excavation. Should excessive sloughing and/or silting occur, the material shall be removed from the excavation prior to filling with sand.
4-07. Plant. — The plant shall be of a size sufficient to meet the requirements of the work, and shall be kept at all times in condition for efficient work, all subject to approval. * * *
12. The dredging contract expressly provided that the work be commenced as promptly as possible, and that the work based on the dredging and removal of 400,000 cubic yards of rocky fill and 3,623,000 cubic yards of soft material was to be completed on or before November 22, 1946. The contract contained the same provision regarding extension of time for completion as is stated above in the second sentence of paragraph 1-06 of the dredging specifications. The contract also provided for liquidated damages as stated above in paragraph 1-07 of the dredging specifications.
13. The dredging contract provided that the contractor would supply the materials and perform the work necessary to complete the performance required. The dredging work was essentially an equipment project, and few materials were required.
The dredging contract contained the identical articles 2, 4(e), and 16 as were contained in plaintiff’s contract, and quoted in finding 5.
Article 4(b) of the dredging contract contained in pertinent part the following provisions:
(b) Changed Conditions. * * * should the Contractor encounter, or the Government discover, during the progress of the work, subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as being inherent in work of the character provided for in the plans and specifications, the Contracting Officer shall be notified before the existing conditions are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall be modified by the Contracting Officer to provide for any increase or decrease in cost and difference in time re- *89 suiting from such conditions. Such modification by the Contracting Officer shall be final, subject only to appeal under the provisions of Article 16 hereof.
Article 10(a) of the dredging contract contained in pertinent part the following provisions concerning changes:
(a) The Contracting Officer may at any time or times, by a written order, and without notice of the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. * * *
14 In preparing its unsuccessful bid for the dredging work as well as its bid on the contract in suit, plaintiff considered and was familiar with the specifications covering the proposed dredging contract, and also was familiar with the site of the proposed work under both contracts.
Plaintiff assumed that the contractor performing the dredging work would be required to employ as a minimum two hydraulic dredges and one dipper dredge, and that the dredging contractor would use such additional clamshell dredges and draglines as would be necessary to remove the rocky fill and complete the performance of the dredging contract within the 150 days allowed for its performance. The need for additional equipment was suggested by the increase, provided by the addendum before opening of bids, in the defendant’s estimated quantity of rocky fill from 310,000 cubic yards to 400,000 cubic yards, without any corresponding increase in the performance time of 150 calendar days. Plaintiff also assumed that the dredging contractor would be required to maintain the equipment in proper operating condition at all times in order that the work would not be delayed by an unreasonable amount of downtime for repair of equipment.
15. In preparing its bid on its contract, plaintiff did not assume that all of the work under the dredging contract would have to be completed before construction of the quay wall and piers could commence. To enable plaintiff to begin *90 work, it was necessary that the dredging work be completed in the area from the shoreline past the quay wall site to about one-fourth of the inboard ends of the two piers, with the necessary trenches for the quay walls and two piers excavated and sandfilled in that area. Plaintiff reasonably assumed that priority would be given to that part of the dredging work. The dredging and sandfilling of trenches on the remaining area of plaintiff’s site did not have to be completed before plaintiff could commence its work, and the dredging in that area and in the approach area outboard of plaintiff’s work could be performed simultaneously with plaintiff’s work without interference between the two operations. Plaintiff assumed that the defendant would require that the dredging work be completed, first at the site of the quay wall and the inboard ends of the piers and that it would be able to commence its work by approximately October 1,1946.
16. Plaintiff reasonably intended to start construction of the quay wall as its first operation, and then proceed with construction of the piers and mooring platforms at their inboard ends. It is the customary and practicable procedure to construct piers from the shore end outward to completion for practical reasons of access and supply of equipment and materials. To commence construction at the outboard end would have greatly and unreasonably increased the costs of construction because of the difficult problems of supply of materials, equipment, labor and working and storage space in a waterborne operation. Commencing at the outboard end would have caused interference with any remaining uncompleted dredging work on the inboard end of plaintiff’s site, and would have been unreasonable and impractical because of the necessity of giving priority to the completion of the dredging work.
17. On June 25, 1946, immediately following the opening of bids on plaintiff’s contract, a conference was held between representatives of the plaintiff and Captain Walter T. Eck-berg, the Public Works Officer of the San Francisco Navy Yard, who was the Officer in Charge of Construction on both the dredging contract and plaintiff’s contract. The purpose of the conference was for inquiry by the defendant as to *91 wh.eth.er plaintiff had sufficient equipment and financial backing to perform the contract. Defendant raised no question as to plaintiff’s ability to perform. The parties discussed availability of steel sheet piles as related hereinafter in these findings. The availability of the site was not discussed.
18. Having received notice to proceed on June 27, 1946, plaintiff by letter dated June 28,1946, formally notified defendant’s Officer in Charge that delay in performance existed because the site of the work was not available, and requested that plaintiff be granted an extension of time commensurate with delay in obtaining the site, the amount to be determined at a later date when it could be definitely calculated. By letter dated August 19, 1946, with which plaintiff returned copies of the formally executed contract, plaintiff again notified the defendant that the site was not available, and requested an extension of time for performance, to be determined when the site was made available.
19. On August 21, 1946, plaintiff’s project administrator met with defendant’s Officer in Charge who advised that the site of the mooring platforms would be available considerably in advance of the sites of the two piers and quay wall and strongly urged that plaintiff start construction of the mooring platforms at their outboard end. This request was referred to plaintiff’s president, and plaintiff declined because such a procedure was impractical and would greatly increase the costs of construction.
On December 31,1946, at a time when the dredging contractor had completed its work at the outboard ends of the two piers, defendant’s Officer in Charge urged that plaintiff commence construction at the outboard ends of the mooring platforms and Pier No. 2. He also advised plaintiff that the site of Pier No. 1, the northernmost of the two piers, would be entirely available by January 20, 1947, and Pier No. 2 on February 1,1947. Plaintiff’s representatives declined to start work at the outboard ends, and reiterated their reasons of impracticality and excessive cost.
20. By letter to the plaintiff dated January 6, 1947, defendant’s Officer in Charge confirmed his oral advice as to when the sites of the two piers would be available, stated *92 that the site of the mooring platforms had been available since December 10, 1946, made reference to previous discussions concerning commencement of construction on the platforms, and urged the plaintiff to start construction operations on its contract as rapidly as availability of site permitted and to prosecute the work to the earliest possible completion.
By letter to the defendant’s Officer in Charge, dated January 10, 1947, plaintiff replied with detailed explanations that it was impracticable to start work on the mooring platforms prior to the work on the quay wall, made reference to its previous letters concerning non-availability of the site, and stated that the site was still not available for the logical construction procedures necessitated by the nature of the project.
21. Sufficient site for plaintiff to commence work did not become available until January 20, 1947, when the site of Pier No. 2 instead of Pier No. 1 became available. The entire site of plaintiff’s work became available on February 15, 1947. The dredging contract was completed on February 17,1947, 87 calendar days after the specified completion date.
22. On June 12, 1946, the date of the opening of bids on the dredging contract, a pre-award conference was held between representatives of Case-American and defendant’s Officer in Charge to inquire whether Case-American had the qualifications, facilities and financial resources to perform the contract. Case-Amei’ican advised it did not own a dipper dredge but could obtain the dipper dredge Seattle which was then located at Seattle, Washington. It was the only dipper dredge available on the Pacific Coast. Case-American further advised that it intended to subcontract part of the work, particularly the excavation of rocky fill to the extent that it was a land operation, that it owned one hydraulic dredge, and that it could provide “one or more” such dredges.
Because of the lack of availability of dipper dredges, floating clamshells were customarily used in the San Francisco area to perform work such as the rocky fill excavation, and they were readily available. No discussion was had concerning use of clamshells. Defendant’s officer made no inquiry of Case-American as to when the dipper dredge Seattle *93 would be brought to the project site, but assumed that land excavation of rocky fill would be commenced first and that delivery of the dipper dredge would follow at the reasonable discretion of the dredging contractor.
23. Case-American subcontracted practically all of the work under its dredging contract. Having no dipper dredge and not contemplating use of floating clamshells, Case-American subcontracted all of the rocky fill excavation to a joint venture, one member of which was the owner of the dipper dredge Seattle. In turn, this subcontractor sublet that part of the rocky fill excavation to be done by draglines in shore operation.
Case-American owned and intended to use a hydraulic dredge which was completing a dredging contract on San Francisco Bay at the Alameda Air Force Base. In late June or early July 1946, as the Alameda contract was about completed, this dredge pulled into its suction pipe a 40-millimeter shell which exploded and destroyed its pumping machinery. Case-American then subcontracted all of the hydraulic dredging under its contract. This subcontractor in turn sublet part of this work. Case-American also entered into a subcontract for the furnishing and placing of the sand backfill in the trenches for the two piers and quay wall.
24. Shortly after the receipt by Case-American of notice of award of the dredging contract on June 25, 1946, defendant’s Officer in Charge had a series of conferences with representatives of Case-American and advised them that the dredging operations should be accomplished in such a manner as to make the site available for the Gerwick company as soon as possible. The defendant’s Officer in Charge explained that Gerwick would probably start its operations with the driving of the steel sheet piles for the quay wall at the northern end of the project, beginning at the point where the quay wall was to be tied into the previously constructed regunning mole and proceeding in a southerly direction to operations on the two piers and the mooring islands. He emphasized that the defendant desired Case-American to give priority to completion of its dredging operations in the area of the site of plaintiff’s work. He also requested Case-American to submit a plan of operations and progress schedule.
*94 25. Only one hydraulic dredge was used at any one time during the performance of the dredging contract. The hydraulic dredge Papoose began work at the site on July 9, 1946, 14 days after receipt by Case-American of notice to proceed. On August 7,1946, the motor of the Papoose failed and it was removed from the project. On August 15, 1946, the hydraulic dredge Pearl Harbor was brought onto the job as a replacement and was used until October 12, 1946, when it was removed and replaced by the Papoose which thereafter worked until completion of the dredging operations as the only hydraulic dredge on the project.
The function of the hydraulic dredge was to excavate mud, sand, and clay by means of cutting blades and suction equipment. The spoil was carried through a floating pipe line to a disposal area in the bay about 5,000 feet distant. The rocky fill excavation had to be completed before hydraulic dredging of the rocky fill area could be performed. Otherwise, the rocks or boulders would destroy the cutting blades and seriously damage the suction machinery of the hydraulic dredge. One hydraulic dredge was not sufficient to perform the dredging work in its entirety within the 150 calendar days allowed for completion. One such dredge would have been sufficient to complete the dredging of the site of plaintiff’s work within that time had adequate equipment been employed to remove the rocky fill and had priority been given to completion of the dredging in that area.
26. On July 29,1946, Case-American submitted to defendant its formal progress schedule setting forth its plan for completion of the dredging work. Hydraulic dredging outboard of the rocky fill area had been in progress since July 9, 1946. The rocky fill excavation by land operations commenced on July 3, 1946, with the use of tumapulls, and shortly thereafter land-based draglines were employed. The land-based equipment could not remove rocky fill more than 100 feet from the shore line, and floating equipment was required to remove substantial quantities of the rocky fill. The dipper dredge Seattle commenced the offshore removal of rocky fill on August 1,1946,36 calendar days after receipt by Case-American of notice to proceed.
*95 Case-American’s progress schedule was prepared in two parts, one for the complete job and the other for the completion of the area north of the proposed location of cell 36 of the quay wall, which latter area included the proposed site of Pier No. 1 as well as the first 35 cells of the quay wall and the corresponding sand backfill area between the shoreline and the quay wall. Case-American recognized that completion of the north part of the rocky fill areas would permit the Gerwick company to proceed with construction of the quay wall and operations on one pier. In setting forth its proposed progress, Case-American treated the three major aspects of the dredging work: rocky fill excavation, hydraulic excavation, and sand backfill.
Case-American divided its plan for removal of the rocky fill into land and water operations, that is, excavation by draglines on the shore and dipper dredging. Of the contract quantity of 400,000 cubic yards of rocky fill, it planned to remove about 280,000 cubic yards by dragline excavation to be completed September 21,1946. The balance of 120,000 cubic yards was to be removed by dipper dredging, to be commenced on July 30 and completed on October 20, 1946. As to the north part of the site of plaintiff’s work, Case-American planned to complete the dragline excavation (about 120,000 cubic yards) by August 20 and the dipper dredging (about 40,000 cubic yards) by August 30, with the period thereafter to September 15, 1946, reserved for exploring for and removing any rock which was deeply imbedded in the mud of the bay.
For the purpose of the hydraulic dredging, Case-American divided its entire project site into three areas: (1) Area #1, lying between the outboard end of the rocky fill area and a station line extending north-south just east of the outboard ends of the piers; (2) Area #2 being the rocky fill area and the sites of the trench digging; and (3) Area #3 lying outboard of Area #1. It was stated that the areas were to be excavated in the order of their numbers. Area #1 and #2 involved the site of plaintiff’s work, whereas Area #3 was outboard thereof.
Area #1, which involved an estimate of 1,600,000 cubic yards of hydraulic dredging, had been started on July 9th *96 by tbe hydraulic dredge Papoose, and Case-American planned to replace the Papoose with the hydraulic dredge Pearl Harbor on August 5 and complete this area on October 10, 1946. It was explained that the Papoose would be removed for extension of its ladder, apparently for the deeper dredging required in Area #2.
Area ‡£2, involving about 1,206,000 cubic yards, was to be started about September 15 and completed November 30, with use of the Papoose. It was stated by Case-American that the Papoose would start in the north part of Area #2 and would remove the estimated 620,000 cubic yards in that part by October 30,1946. It was further stated that in order to allow the sand backfill to progress continuously, the Papoose might use three or four days in this period to dig the trench for one of the piers.
Case-American stated that the hydraulic dredging of the estimated 604,000 cubic yards of material in Area #3 could commence on October 1 and be completed on November 1, 1946, provided sufficient floating pipeline was available or arrangements could be made to deposit the spoil in a nearby cove. Obviously, this schedule of hydraulic dredging would have required use of two hydraulic dredges at the same time. It was stated that without sufficient pipeline or use of the nearby spoil site, it would be impossible to start Area #3 before December 15 and that completion would be on January 15, 1947, with employment of only one hydraulic dredge at any one time. This latter date was scheduled by Case-American as the time for completion of all of its work in the event only one hydraulic dredge was used.
Regarding the sand backfill for the trenches, Case-American planned to employ the seagoing hopper dredge with an asserted capacity to deliver 100,000 cubic yards per month, and it was stated that 3 months would be needed for the required 305,000 cubic yards. The hopper dredge was scheduled to start between September 1 and 15, and complete on December 31, 1946. It was estimated that about one-half of the total backfill would be in the north part of plaintiff’s site and that 45 days would be required to fill that part. On the basis that the hopper dredge would be able to commence work in that area on October 1, Case-American advised that *97 that area would be available to the Gerwick company for commencement of its operations by November 25, 1946.
27. In summary, the Case-American plan of progress, as it related to the dredging work in its entirety, indicated completion of the dragline excavation on September 21, 1946; the dipper dredging on October 20, 1946; the hydraulic dredging on November 30, 1946, if two hydraulic dredges were employed during a substantial part of the time; the sand backfill on December 31, 1946; and the hydraulic dredging on January 15,1947, if only one hydraulic dredge was used at any one time.
On the north part of the site of plaintiff’s work, where plaintiff expected to commence its operations, a summary of the Case-American plan indicates proposed completion of the dragline excavation by August 20, 1946; the dipper dredging (allowing two weeks for exploring for and removing deeply embedded rock) by September 15, 1946; the hydraulic dredging by October 30,1946, and the sand backfill by November 25, 1946.
28. By letter dated July 30, 1946, defendant’s Officer in Charge advised Case-American concerning its progress schedule in pertinent part as follows:
Subject to contract requirements, the order in which the work is to be prosecuted is approved, but in view of the contract date for completion being 22 November 1946, the scheduling of the work so that it will not be completed prior to 15 January 1947 is not approved.
It is directed that steps be taken to prosecute the work at a rate that will insure its completion within the contract date of completion of 22 November 1946. In this connection, your attention is called to Paragraph 4-01 of the contract specification which states in part. * * * “It is considered necessary that not less than one dipper dredge and two hydraulic dredges be employed.” It is noted that thus far only one hydraulic dredge has been employed on the work.
29. In reply to this last-mentioned letter, Case-American by letter dated August 1, 1946, advised defendant’s Officer in Charge, as follows:
We are in receipt of your letter, reference (a), in which you disapproved the scheduling of the work for the hydraulic dredging and for the sand back fill. We *98 appreciate that in order to complete all of tbe hydraulic dredging by the contract date for completion, it will be necessary to employ two hydraulic dredges for a short period at some time during the life of the job. The use of two hydraulic dredges, however, will in no way benefit the schedule for the sand back fill, which as you know is dependent upon the hydraulic dredging under Item #3, which in turn is dependent upon the rocky fill removal under Item #1. We feel that the dragline equipment on the job is ample to keep well ahead of the other operations, and have secured the services of the only available dipper dredge to remove the rocky fill that the draglines cannot reach. Due to the nature of the work involved in the deep trench digging (Item #3) it is impractical to attempt to use more than one hydraulic dredge on that portion of the work.
With the above in mind, we see no way to arrange the work so as to be able to start the sand back fill ahead of the date shown on the progress schedule. The use of two hydraulic dredges, will however, allow the dredging in the outboard section of the dredging area, which does not interfere with the construction of the future piers and bulkhead, to be completed on time.
We are making every effort to mobilize sufficient floating pipeline and/or secure a disposal area south of the property of the San Francisco Naval Shipyard which can be reached by “shore pipe” in order to complete the dredging by the contract date for completion.
30. By letter to Case-American, dated August 6, 1946, defendant’s Officer in Charge advised that the last above-quoted letter indicated little or no improvement in the schedule of progress previously submitted, and warned Case-American that liquidated damages would be assessed in accordance with contract provisions unless the work was completed by November 22, 1946, or such extended time of completion as might be authorized by the terms of the specifications of the contract.
The defendant’s Officer in Charge also advised that a disposal area in the nearby cove, mentioned in Case-American’s progress schedule, was not approved and that disposal of dredged materials would continue as required in the specifications.
31. By letter dated August 26,1946, the defendant’s Officer in Charge advised Case-American as follows:
*99 It is noted tliat fair progress is 'being made in the stripping work under subject contract m connection with the removal of fill to elevation 90.
The progress, however, of the hydraulic dredging, particularly the deep hydraulic trench dredging, is non-satisfactory, and it is requested that steps be taken to expedite this work so that the contract work as a whole will be completed within the contract time of completion.
32. On September 26, 1946, Case-American at the request of defendant’s Officer in Charge submitted a supplementary progress schedule which indicated completion of rocky fill excavation by October 31, 1946, the hydraulic dredging and trench excavation within the rocky fill area by January 7, 1947, the sand backfill in the trenches in the north part of plaintiff’s site by January 11, 1947, all remaining hydraulic dredging by January 22,1947, and all remaining sand back-filling in trenches by January 28, 1947.
By letter to Case-American dated October 7, 1946, defendant’s Officer in Charge indicated approval of sequence of operations but disapproval of the schedule of time requirements, and complained that the only hydraulic dredge on the project was being employed outboard of the area of the trench excavation and sand backfill, contrary to the schedule of operations.
33. The dipper dredge Seattle was employed on the rocky fill excavation from August 1,1946, until November 13,1946. Until August 7, 1946, its boom was equipped with a 5.5-cubic yard bucket, but thereafter a 3-cubic yard bucket was used. The reduction in the size of the bucket was necessitated by the poor mechanical and operating condition of the Seattle. The use of the smaller bucket substantially reduced the rate of. excavation of rocky fill that could have been accomplished had the Seattle Seen in condition to employ the larger bucket. It was intended that the Seattle would be employed, as was customary in such dredging work, three shifts per day for six days per week, with the seventh day reserved for maintenance and repair. During the period of its operations on this job, the Seattle was idle 856 hours of the total of 2,136 hours available on the basis of intended operations. Most of this lost time was due to breakdowns because of her poor condition. Because of lack *100 of reaching capacity, the Seattle was unable to remove rocks deeply imbedded in the mud.
The Seattle was tbe only floating equipment used to remove rocky fill until October 16, 1946, when a clamshell dredge was brought onto the project and employed until January 8, 1947. The clamshell was used only to remove rock deeply imbedded in the mud, and worked only one eight-hour shift per day, contrary to the customary operations of three shifts per day. It removed only 5,450 cubic yards of rocky fill. To find the imbedded rock, the dredging contractor used only one piece of jetting equipment. This was mounted on a barge. The imbedded rocks were scattered over the entire rocky fill area, and more jetting and clam-shell equipment could have been used for longer hours to accomplish earlier removal of the imbedded rock.
The hydraulic dredging of the site of plaintiff’s work was delayed because such dredging could not proceed in the areas of the quay wall and the inboard ends of the piers until the rocky fill and the deeply imbedded rocks had been removed.
34. Defendant’s Officer in Charge frequently met with Case-American’s superintendent and orally expressed dissatisfaction with the rate of progress of the dredging work. He repeatedly urged that Case-American employ more equipment. However, he did not order that more equipment be added because he believed that the defendant’s agents had no right under the contract to direct the method of accomplishing the contract, but were limited to the sanctions provided by the contract.
Article 25(a) of the dredging contract provided as follows:
The performance of work under this contract may, subject to the provisions of paragraph (a) of Article 26, be terminated by the Government in accordance with this article in whole, or from time to time in part, Whenever the Contractor shall default in performance, or shall so fail to make progress in the prosecution of the work hereunder as, in the opinion of the Contracting Officer, to endanger performance of this contract in accordance with its terms. Termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Teimination specifying that termination is for default or failure, the extent to which performance of work under this contract shall be ter- *101 initiated, and the date upon which such termination shall become effective.
Defendant’s Officer in Charge did not recommend termination of the dredging contract to his Contracting Officer on account of Case-American’s delays in performance because it was his reasonable belief that such procedures would cause even greater delay in completion due to the necessity of surveying the uncompleted job and preparing specifications for and reletting another contract for the work.
35. Because of the inability of the dipper dredge Seattle to remove deeply imbedded rock, Case-American added the clamshell to the job, as related in finding 33, and by letter dated October 31,1946, advised defendant’s Officer in Charge in pertinent part as follows:
The Officer-in-Charge of Construction verbally instructed the contractor to employ an additional dipper dredge on the subject contract in order to speed up the removal of rocky fill. There being no other dipper dredge in the San Francisco Bay Area, the Officer-in-Charge of Construction later instructed the contractor to provide a clamshell dredge.
The contractor is currently using a clamshell dredge to augment the efforts of the dipper dredge “Seattle”. * * *
In conferences with defendant’s Officer in Charge, Case-American’s superintendent, in response to urgings that additional equipment be employed, had taken the position that defendant’s agents had no right to give orders as to the methods of operation or as to the pieces of equipment to be used. By letter dated November 4,1946, defendant’s Officer in Charge replied to the above-quoted letter, in pertinent part as follows:
Paragraph 1 of Eeference (a) states that the Officer in Charge of Construction verbally instructed the contractor to employ an additional dipper dredge and later instructed the contractor to provide a clamshell dredge.
The implication of Paragraph 1 of Eeference (a) that the Officer in Charge of Construction has attempted to direct the contractor on how to accomplish the contract work is in error since the Officer in Charge of Construction has limited himself to expressing dissatisfaction *102 with the progress being made on subject work, indicating that in his opinion the poor progress was due to insufficient equipment being operated by the contractor, and calling the attention of the contractor to Paragraph 4-01 of the subject specifications which states in part, “It is considered necessary that not less than one dipper dredge and two hydraulic dredges be employed.” It is the responsibility of the contractor to do the work called for by the specifications using methods of work that will accomplish safely the results required by the contract within the contract time for completion.
36. On July 17, 1946, Case-American, together with its consulting soils engineer, conferred with defendant’s Officer in Charge and called attention to the possibility that slides would occur during the excavation of the rocky fill as a result of the relatively greater weight of the rocky fill as compared to the bay mud which it overlaid. Case-American and its consulting engineer recommended that defendant add to the contract work the removal of materials on the shore above the water line for a distance of 150 feet back from the top of the slope as it would exist after performance of the work specified by the defendant. Case-American proposed that such removal of surcharge would eliminate the possibility of slides. Removal of materials at the higher levels of the slope in the rocky fill area was then in progress by use of draglines in land operations, but rocky fill excavation did not commence at the lower levels on the slope until commencement of the waterborne operations by the dipper dredge Seattle on August 1, 1946. Defendant’s Officer in Charge recognized the possibility that slides might occur. Because the removal of the surcharge as recommended by Case-American would require the removal of two barracks buildings and four Homoj a huts, he verbally informed the dredging contractor several days after the conference that the work should proceed in accordance with the contract drawings, without removal of additional surcharge on the slope. However, he cautioned the dredging contractor to exercise care in removal of the rocky fill and advised excavation of the materials by step method from the top of the slope toward the bottom.
In its progress schedule submitted to the defendant on July 29,1946, Case-American stated that in view of past ex *103 perience on an adjoining project, it was recognized that hydraulic dredging could not be done too close to the rocky fill operations, and that its engineers had advised Case-American that there was a possibility of a slide regardless of precautions taken unless the overburden at the top of the slope be stripped back beyond the limits of the present project line.
By letter dated October 3, 1946, Case-American reminded defendant’s Officer in Charge of the matters discussed at the July 17th meeting and of his decision that the contract work would proceed without removal of additional surcharge, and advised that the dredging contractor was making preparations to proceed with the deep trench dredging for the quay wall. Case-American requested that further consideration be given to the probability of slides occurring, and submitted a report of its consulting soils engineer who therein advised that unless the surcharge was removed for the full length of the top of the slope on the shoreward side of the project, the banks would slide, causing rocky material to fall into the deep trench with the further probability that the rocky material would be covered with mud after the slide. Case-American further suggested that removal of the material after sliding into the trench would be much more costly than if it were removed as surcharge in its original position. Defendant had its engineers study Case-American’s recommendation, and by letter dated October 28, 1946, defendant’s Officer in Charge directed Case-American to cut a horizontal shelf or berm 20 to 40 feet wide in the existing dredged shore slope in order to relieve any surcharge pressure on the slope which might develop when the deep trench was excavated for the quay wall. The yardage for this additional excavation was estimated at 13,300 cubic yards to be paid for at the contract unit price provided for rocky fill excavation. The actual quantity removed was 14,966 cubic yards.
The subcontractor on the excavation of rocky fill by drag-lines in land operations had previously completed its work, and it was necessary for the dredging contractor to arrange for the return of the necessary equipment to the job site. Nine days were required to remobilize this equipment, and *104 three days thereafter were required to accomplish this additional work. The defendant’s Officer in Charge directed that hydraulic dredging in the area of cells 1 to 10 of the quay wall not proceed until removal of the additional surcharge. However, neither the hydraulic dredging of the rocky fill area nor the excavation of the trench for the quay wall could proceed until completion of removal of the rocky fill, as related in finding 33.
37. Since the rocky fill material had to be removed before hydraulic dredging could proceed in the areas of the quay wall and the inboard ends of the piers, the dredging contractor started the hydraulic dredging outboard of but close to the rocky fill area. Between July 9, 1946, and August 2, 1946, the Papoose performed hydraulic dredging commencing at the northerly end of the dredging site and proceeding southerly through the outboard area of Pier No. 1 and to the outboard end of Pier No. 2, all outboard of the rocky fill area. The Papoose then endeavored to dredge an area at the north end of the project close to the quay wall site, but encountered rocky fill and was unable to continue there. From August 5 through 7, 1946, the Papoose dredged materials in the area of the inboard end of Pier No. 1, approaching about 50 feet distant from the quay wall site. The motor of the Papoose then failed, and it was removed from the project. Eight days later the hydraulic dredge Pea/rl Harbor commenced operations, and from August 15 to 26, 1946, dredged the area at the south end of the dredging site, just south of the site of the mooring platforms and outside the site of plaintiff’s work. The Pearl Harbor then worked northerly in a series of moves, and between August 26 and October 5,1946, dredged the areas of the mooring platforms, the areas between the mooring platforms and the outboard part of Pier No. 2, the outboard part of the site of Pier No. 2, and the remaining areas between the outboard ends of the two piers, all of which work was outboard of the rocky fill area and extending somewhat beyond the outboard ends of the piers.
From October 7 to 12,1946, the Pearl Harbor dredged approach areas entirely outboard of the site of plaintiff’s work and then was removed from the project.
*105 On October 14,1946, the Papoose returned to the project and until October 17, engaged in excavating part of the deep trench for Pier No. 1, outboard of the rocky fill area. The Papoose thereafter dredged areas immediately south of the inboard end of Pier No. 1, and on October 21, 1946, dredged an area outboard of the northern portion of the quay wall site, and next excavated for one day on the inboard portion of the deep trench for Pier No. 1. From October 23 to 25, the Papoose excavated the deep trench for the outboard part of Pier No. 2, after which it moved to the site of the mooring platforms. Beginning at the outboard end thereof, the Papoose dredged toward the shore, completing the site of the mooring islands and their access and connecting trestles by November 2, 1946. This dredge then spent Sy2 days dredging on the northern edge of the rocky fill area at the north end the project. On November 7,1946, it moved to the area south of the inboard part of Pier No. 2 and worked northerly, dredging through the site of the inboard end of Pier No. 2, the remaining area between the two piers 'and a part of the quay wall site between the two piers, and completed these areas on November 29, 1946. Thereafter, the Papoose again returned to the north part of the project and from November 30, 1946 to January 2,1947, dredged the areas at and about the site of the first 26 cells of the quay wall. For the purpose of deep dredging of the trench in this area, it was necsssary to remove the Papoose from the project for extension of its ladder from December 7 to 13, 1946, during which time no hydraulic dredge was on the project. After completion of the north part of the quay wall site, the Papoose worked southerly and completed the site of the quay wall on January 13, 1947, and the remaining part of the site of Pier No. 1 on January 15, 1947.
Certain mounds or ridges above contract elevations had been formed adjacent to the site of Pier No. 1 by the heaving of mud due to the deposit of sand backfill in the trench for that pier, and by letter dated January 9, 1947, defendant’s Officer in Charge directed Case-American to remove them. Although the Papoose was engaged in dredging at the inboard end of Pier No. 1 on January 14, and 15, 1947, the Papoose was not then employed on removal of the mounds *106 but was transferred to the approach areas for completion of the remaining hydraulic dredging outboard of plaintiff’s site. The approach areas were completed on January 31, 1947. The Papoose then returned and completed the removal of the mounds on February 7,1947, on which date the hydraulic dredging was finished.
38. As the excavation of the areas for the trenches for the quay wall, piers and mooring platforms were completed, the sand backfill was deposited. Performance of this operation was necessary to make the site ready for plaintiff’s work. The sand backfill was completed at Pier No. 2 by January 20, 1947, and on the rest of the trenches by February 17, 1947, on which date the work on 'the dredging contract was accepted by the defendant'as complete.
39. The performance of the dredging contract having been delayed 87 calendar days beyond the date provided for completion, Case-American requested extensions of time in the total amount of 85.23 calendar days, comprised of 2.43 days for encountering artificial obstructions, 25.60 days for changed conditions in rocky fill excavation, 31.34 days for overrun of rocky fill excavation, 22.56 days for overrun of sand backfill, and 3.3 days for adverse weather.
The recommendations made by defendant’s Officer in Charge to his Contracting Officer were as follows: (1) that no time be allowed for encountering alleged artificial obstructions or for bad weather, (2) that 9 days be allowed for remobilization of draglines and trucks to remove the 14,966 cubic yards of material constituting surcharge on the rocky fill slope, previously described in finding 36, (3) that 13.5 days be allowed for overrun of rocky fill material in the amount of 33,759 cubic yards (including the above-mentioned 14,966 cubic yards of surcharge) at the specification rate of one day for each 2,500 cubic yards of such overrun, and (4) that 22.5 days be allowed for the overrun of 101,544 cubic yards of sand backfill. The total of the time extensions recommended by defendant’s Officer in Charge amounted to 45 calendar days.
On April 1, 1947, defendant’s Contracting Officer concurred in the recommendations of the Officer in Charge, and accordingly a change order was issued to Case-American by *107 the defendant, which extended the contract completion time by 45 calendar days to January 6, 1947.
Liquidated damages for the remaining 42 days of delay in completing the dredging contract were assessed against Case-American in the sum of $16,800 at the contract rate of $400 per day.
40. The delay in availability of the site of plaintiff’s work resulted from delays by the dredging contractor in the performance of the dredging contract. These delays of the dredging contractor were due to late commencement of the removal of rocky fill in waterborne operations, the failure of the dredging contractor to employ adequate and efficient equipment in the removal of rocky fill in waterborne operations, and the failure of the dredging contractor to have available a hydraulic dredge with sufficient reaching capacity when needed to excavate the deep trench for the quay wall.
These delays and the consequent delay in availability of the site of plaintiff’s work were not due to any fault, lack of diligence, or negligence on the part of the defendant.
41. As provided in plaintiff’s contract and specifications, the defendant was to furnish all steel sheet piles required for construction of the quay wall. Plaintiff reasonably intended to start driving the piles for the quay wall at the outset of its operations, and it was apparent to all concerned that the steel sheet piles should be provided to plaintiff at the commencement of its operations hi order that the quay wall could be completed at the earliest date possible. Driving of the piles had to precede the placing of sand backfill in the cells and behind the quay wall, and the completion of sand backfilling was necessary to enable plaintiff to install the extensive mechanical and electrical facilities in and behind the quay wall within the time provided for completion of the project. Prompt placing of the sand backfill behind the quay wall was also desirable because a more convenient storage area for supplies would be thus afforded.
Plaintiff did not intend to delay all work on the piers until completion of the quay wall and sand backfill, but expected to build at least one temporary access trestle, that one to extend from the shore to the inboard end of the site of Pier *108 No. 2. Plaintiff bad reasonably intended that prompt construction of the quay wall would permit tbe placing of sand backfill in the north part of the area behind the quay wall to the extent that access would be thereby provided to Pier No. 1, eliminating the necessity for a temporary access trestle for that pier. Plaintiff had also reasonably anticipated that early completion of the quay wall and sand backfill would provide access for construction of the mooring platforms and their permanent trestle, without the necessity of construction of a temporary access trestle to the inboard end of this work.
42. At the conference held on June 25, 1946, previously mentioned in finding 17, plaintiff’s representatives made inquiry concerning when the steel sheet piling for the quay wall would be delivered by the defendant. All parties present understood that plaintiff needed the piles as soon as the site of its work became available after reasonable prosecution of the work on the dredging contract. Plaintiff’s representatives suggested that they be allowed to order the piling if any difficulty in obtaining prompt delivery was anticipated, suggesting that they were in a better position to expedite delivery. Defendant’s Officer in Charge replied that there would be no difficulty in the timely supplying by the defendant of the steel sheet piles, that the piles had been requisitioned by the defendant from a commercial source, and that if any difficulty in delivery occurred, plenty of piles could be obtained from Navy supplies at Port Hueneme, California. One of plaintiff’s officers had recently visited Port Hueneme, and from a distance noticed large stocks of piling, but had made no observations as to shapes and lengths of the pieces.
43. Defendant caused a shipment of piling to be made from Port Hueneme to the project site, such shipment consisting of 850 pieces as compared to the 4,800 required for the quay wall. These pieces were M-112 shapes, but were only 50 feet long, whereas the greater quantity of piles required for the quay wall were M-112 shapes varying from 64 to 72 feet in length. In this shipment there were none of the required M-113 shapes which had to be 76 feet long.
Defendant furnished a list of the piling in this shipment and requested information as to whether, by making changes *109 in tbe field, these piles could be used on tbe quay wall. Defendant bad undertaken by tbe contract to furnish tbe piles, each in one piece of tbe required lengths. By letter to the defendant dated September 11, 1946, plaintiff suggested a method of using tbe piling from Port Hueneme by cutting some of the piles into short sections and welding a short section to each of the remaining piles to obtain the required lengths. By using the 850 piles, 637 piles would be thus provided, each 64 feet long. Plaintiff never received any reply from the defendant, and no piles from Port Hue-neme were ever used on the project. Welding of sections of sheet piles to obtain desired lengths for quay wall construction is not considered sound engineering practice.
44. While defendant had actual knowledge of the delays in furnishing the required piles for the quay wall, plaintiff repeatedly advised the defendant in writing of the delays and its need for the piles at the earliest date possible.
By letter dated July 10,1946, plaintiff requested defendant to advise when the piling would be available for use, and defendant replied by letter dated July 17,1946, that delivery dates could not be furnished until the opening of bids for such piling, expected to take place on July 18, 1946.
By letter dated August 1, 1946, plaintiff again requested information concerning delivery of the piling, stating that it was imperative that the information be received in order that plaintiff’s work could he planned. No reply having been received, plaintiff by letter dated August 26,1946, again requested the piling delivery information and advised that substantial delays might require complete change of planned construction procedures. On September 4, 1946, defendant forwarded to plaintiff for checking a list of the steel sheet piling being procured by defendant. If the requisition had remained as set forth on the list, there would have been a shortage of 45 pieces of M-113 piling, as the list called for 1,247 instead of the 1,292 pieces of such piles required. By letter dated September 6, 1946, plaintiff advised defendant of the deficiency in M-113 piles, and again requested information as to delivery dates.
By letter dated September 23, 1946, defendant’s Officer in Charge advised plaintiff that a contract for the piling “will *110 be awarded” to Camegie-Illinois Steel Corporation, and set forth scheduled delivery dates beginning in February 1947, with completion by May 1947. By separate letters dated December 20, 1946, and January 10, 1947, plaintiff made further requests to defendant concerning currently scheduled delivery dates of the piles.
By letter to the defendant dated February 7, 1947, plaintiff set forth in detail the circumstances concerning delay in delivery of the piling, commented that the entire site of plaintiff’s work would be available on February 15, 1947, but that full use of the site could not be made until after delivery of the piling then scheduled to occur between March and July 1947. Plaintiff explained that the delay in delivering the piles would delay completion of facilities to be imbedded in the sand backfill behind the quay wall and would hamper access to Pier No. 1 and the mooring platforms, requiring temporary access trestles in lieu of use of the sand backfill. Plaintiff also requested an extension of 115 calendar days in the contract time of performance, being the time from January 20,1947, when the site became partially available, to May 15, 1947, when it was estimated that sufficient piles would be available to begin work on the quay wall. By letter dated February 18, 1947, defendant’s Officer in Charge advised plaintiff that he would submit his recommendation on the requested extension of time to his Conti-acting Officer when more definite information became available on delayed delivery of piling.
45. By April 18, 1947, only 620 pieces of piling had been delivered, and all of them were M-112 sections. The M-112 piles were specified for construction of the inboard side of the cells and for the common walls between the cells, whereas the M-113 piles were to be used for the outboard or water side of the cells. By letter dated April 18, 1947, plaintiff advised defendant that all of the piling scheduled for delivery by that date had not arrived, and that driving of piles could not commence until some M-113 piles and special piles had been received. By letter dated April 22, 1947, plaintiff forwarded to defendant a drawing showing the assortment of special piles which would have to be delivered before any driving of piles could commence. The special or comer *111 piles bad to be specially fabricated by cutting plain sheets and welding or riveting them together in such a manner that in cross-section they were shaped like an “X” or a “Y”, and were required for use where the successive cells joined at their corners and had a common wall. Because such special piles lacked the flexibility of the plain piles, it was necessary that these corner piles be driven first and that plain piles thereafter be driven for closure of each cell.
46. By letter dated May 9,1947, plaintiff advised defendant that based on its previous information with respect to planned deliveries of piling, it had expected to begin driving piles for the quay wall by May 15,1947, which it stated was obviously no longer possible. Plaintiff again requested advice as to when the necessary piling would be delivered. In a supplement to this letter, plaintiff emphasized by letter to the defendant dated May 12, 1947, that it was necessary that requisite special piles be delivered before driving of any particular cell could be started.
By letter dated May 14, 1947, defendant advised plaintiff that the first shipments of special piles were expected to arrive about June 20,1947, with delivery of such specials to be completed by the middle of July 1947, and that delivery of the plain piles would be completed by the end of June 1947.
On May 19,1947, defendant furnished plaintiff a shipping schedule for the special or corner piles, which showed the first shipment to begin June 2, 1947, with succeeding shipments until the last to commence June 20, 1947, with 20 additional days required for each transit. By letter dated May 20, 1947, plaintiff advised defendant that contrary to defendant’s indication, the first shipment of specials, scheduled to start June 2,1947, would not be sufficient to complete construction of cells 1 through 8 because seven necessary special piles of a particular type were omitted. Plaintiff again stated that it was necessary that all special piles for any particular cell be delivered before that cell could be driven. By letter dated May 27, 1947, defendant advised plaintiff that the June 2 shipment would include the previously omitted seven special pieces mentioned by the plaintiff.
*112 47. On June 24,1947, tbe first shipment of special piles arrived at the project. Having sufficient piles to enable the start of driving of piles for the quay wall, plaintiff commenced such operations on June 26, 1947. By letter to the defendant dated June 24, 1947, plaintiff acknowledged that it had received the special piles required to start construction of the quay wall, but only the specials for the first eight cells of the total of 52 cells. Plaintiff again protested the delay in delivery of the piling and requested that additional compensation be allowed plaintiff for added costs resulting therefrom.
The total weight of all steel piles for the quay wall approximated 5,600 tons. In February 1947, defendant’s supplier, Carnegie-Illinois Steel Corporation, shipped about 700 tons of plain piles, and that initial shipment was received at the project site in March 1947. Deliveries of plain piles continued intermittently thereafter until June 24, 1947, when a substantial supply of plain piles had been received, but only sufficient special piles for the first eight cells.
48. At the right angle turn or corner of the quay wall, formed by cells 9 through 11, a special “X” pile was required to form a connection between the four separate walls of such cells which were joined at that location. When plaintiff reached this point in the pile driving, the necessary special pile had not been delivered. By letter dated July 16, 1947, defendant directed plaintiff to have this special pile fabricated from two M-113 piles in stock. Plaintiff immediately made arrangements to have the fabrication performed by Bethlehem Pacific Coast Steel Corporation in San Francisco, and this special pile was delivered to the project site on August 4, 1947. In the meantime, plaintiff necessarily omitted several plain piles immediately adjacent to the proposed location of this special pile because otherwise it would have been practically impossible to insert and drive such a pile. Plaintiff’s pile driving continued on beyond this location, and when the specially fabricated “X” pile was delivered, it was necessary for plaintiff to bring onto the project an additional floating pile-driving rig because pile driving had progressed six cells beyond that location. The driving of this special pile was made extremely difficult be *113 cause most of the plain piles for the four walls to be joined by tbis pile had been already driven, and the work of closing the cells was severely complicated. Three days were required to set and drive this special pile, whereas one hour would have been sufficient in proper sequence of operations. The placing of sandfill in the cells and behind the wall was delayed about three weeks because such operations could not commence until about ten cells had been completely driven.
By letter dated August 13, 1947, plaintiff submitted its charges for the special pile, which included $864 for subcontract cost of fabrication, and $975 for costs incurred in the way of equipment, labor, materials and overhead for the driving of the special pile and the few plain piles necessarily omitted. Plaintiff agreed to postpone consideration of its costs other than that of fabrication until such time as discussion was to be had concerning additional costs incurred because of delay in furnishing piling. By change order to the contract, dated September 22, 1947, plaintiff was given additional compensation of $864 solely for costs of fabrication of the special pile, but has never been paid for its claimed additional costs.
49. As of July 31,1947, only 152 pieces of the steel sheet piles remained to be shipped from the mills of defendant’s supplier. These consisted of 73 M-113 and 26 M-112 or 99 plain piles, and 53 special piles. Although there were enough plain piles on hand for the first 50 cells, the un-shipped special piles were essential to the construction of the last 32 cells of the quay wall, and until their delivery plaintiff could not reasonably proceed with the setting and driving of piles beyond cell 20. Since about three weeks were required for transit after release for shipment, it was obvious that plaintiff could not work beyond cell 20 until close to September 1,1947.
By September 5,1947, there were still eight pieces of piling, two Tee sections and six special comer piles, which had not been shipped by defendant’s supplier. The two Tee sections, each specified to be 76 feet long, were to be placed in the last cell at the end of the quay wall to allow for future connections in the event defendant ever decided to extend the quay wall in some future project. By letter dated Septem *114 ber 9, 1947, Carnegie-Illinois advised defendant that these two Tee sections had been rejected by defendant’s inspector at its mill as being two inches too short, and requested immediate waiver of the variation in order that they could be released for shipment. By formal change order to the Carnegie-Illinois contract, defendant on September 18, 1947, waived this variation. During the time when the request for a waiver was being processed on the two Tee piles, the sis remaining unshipped special corner piles were held by Carnegie-Illinois because the eight pieces together made a carload lot. These last eight piles were released for shipment on September 18,1947.
By September 2,1947, plaintiff was ready to proceed with the driving of steel sheet piles on cell 36, but could not perform such work because necessary special piles had not been delivered. By letter dated September 3, 1947, plaintiff so advised the defendant. On September 4, 1947, plaintiff was forced to lay off a portion of its crews for the pile driving as a result of lack of special piles, and by letter dated September 5,1947, so advised the defendant. The remainder of the crews were retained by plaintiff in order to maintain a labor force which could resume operations as soon as the needed piles were furnished, but such labor could perform no productive work during the period before the special piles arrived, except for limited activity in driving to grade some piles previously set but not completely driven.
On September 17,1947, the next shipment of special piles arrived at the project, and there then remained to be made the last shipment involving the two Tees and six special corner piles. By letter on the same date, plaintiff again advised defendant that lack of special piles had delayed its work, and repeated an earlier request that a special board be convened to consider the effects of the failure of the defendant to supply the necessary piles as required. By letter dated September 18, 1947, defendant advised that the last shipment of piles had commenced on that date, with delivery expected between October 3 and 6, 1947. These last eight special piles were necessary for driving of the last seven cells. Actual delivery occurred October 7, 1947, and the driving of the piling for the quay wall was completed October 29, 1947.
*115 50. On May 20, 1946, the Navy’s Bureau of Yards and Docks, by requisition, authorized the Navy’s Bureau of Supplies and Accounts to obtain the steel sheet piles for the pertinent quay wall. The requisition stated that the piles should be Carnegie-Illinois Steel Corporation sections, or the equivalent thereof, and the various types were identified by the designations employed by that company. In fact, defendant’s contract drawing showing the layout of the quay wall, prepared and approved by May 29, 1946, called attention for details as to special piles to certain Carnegie-Illinois drawings. In late May 1946, a representative of that company was advised by a design engineer in Yards and Docks of the forwarding of the requisition to Supplies and Accounts, and on June 6, 1946, the same representative informally obtained a copy of the requisition from Yards and Docks and forwarded the same to Carnegie-Illinois, calling attention to the statement thereon that the Navy wanted immediate delivery.
Upon receipt of the requisition on May 24, 1946, the surplus section of Supplies and Accounts surveyed their records as to Navy and other military stocks and found by June 4,1946, that the required piles were not available from those sources. The requisition was returned to the assigned purchasing officer on June 7, 1946, for procurement of the piles by contract.
On June 25, 1946, copies of the request for tender (made public on June 24, 1946) on negotiation of a contract to furnish the piles were mailed to a list of eleven prospective bidders. Six of these prospective bidders were Carnegie-Illinois Steel Corporation, South Chicago, Illinois, and Munhall, Pennsylvania; Bethelehem Steel Company, Lack-awanna, New York; Inland Steel Company, Chicago, Illinois; L. B. Foster Company, New York, N.Y.; California Corrugated Culvert Co., Berkeley, California; and Pacific Union Marbalite Co., Los Angeles, California. The evidence does not show the identity of the other five companies on the mailing list. The last four above-named companies advised defendant in writing that they did not desire to submit bids.
*116 The request for tender provided for opening of bids on July 11, 1946. It failed to state when delivery was desired by the defendant, or that such piles were urgently needed, but provided that time of delivery at bidder’s mills be stated by each bidder. The request for tender recited that an MM priority rating was to be assigned to the contract. This rating was used generally on Navy contracts for steel materials. The request did not notify bidders that the special piles were necessary for the commencement and continued progress of construction of the quay wall, and Yards and Docks had not advised Supplies and Accounts of this fact in the requisition for the piles. The special piles were actually specially fabricated from M-112 and M-113 plain piles, and some plain piles had to be milled before specials could be made.
By letter to each of the prospective bidders, dated July 9, 1946, the opening of tenders was postponed from July 11 to July 18, 1946. Such delay was made because of a change by Yards and Docks in the following specification:
The pile interlocks shall develop not less than 12,000 pounds per linear inch in tension when determined from specimen having a joint length of approximately 8 inches.
The change was to insert “3 inches” in lieu of “8 inches.” The postponement of seven days was deemed necessary by Supplies and Accounts in order to afford time for reevaluation of bids and because the change letter was to be transmitted in the mails to places as far away from Washington, D.C., as California.
51. Only two bids were received, one from Carnegie-Illinois Steel Corporation, and the other from Bethlehem Steel Corporation.
Camegie-Illinois’ bid was in the total sum of $341,545.91, and its tender stated that it would make deliveries of the M-112 plain piling at South Chicago, Illinois, as follows: 900 tons per month in October, November, and December 1946, and the balance of 761 tons in January 1947. With respect to M-113 plain piling, it promised delivery at Mun-hall, Pennsylvania, of 900 tons in February and the balance *117 of 867 tons in March. 1947. Begarding the special piles, it stated that it would plan to complete delivery at Munhall, Pennsylvania, by the end of March 1947. The delivery promises were qualified by the statement that they were subject to receipt of earlier accepted orders from other purchasers.
Bethlehem’s bid was in effect in the same amount as that of Camegie-Illinois, but its promised delivery dates were substantially later. Bethlehem stated that deliveries would commence 200 days after the contract was executed and proceed at a rate of 500 tons per month until shipment of the approximately 5,600 tons of piles was completed.
Both bids were submitted on the Navy printed form of tender and it was provided in print that the tender was subject to acceptance within thirty days from the last date on which tenders could be submitted on the particular negotiation.
52. At the time of the issuance and submission of tenders, it was generally considered that the control of commodity prices by the Office of Price Administration would terminate in the immediate future by refusal of Congress to extend those powers, or at least that any extension would be only for a short period of time. The extension was enacted to November 10, 1946, after which commodity prices were no longer controlled by law.
The defendant’s request for tenders required each bidder to certify that its quoted prices were not in violation of any applicable Government price regulations.
Carnegie-Illinois provided in its tender the following concerning prices:
The prices stated herein are subject to adjustment to the Contractor’s prices in effect at time of shipment. The contractor represents and warrants that such prices shall not exceed applicable maximum prices lawfully established by the Office of Price Administration, or other authorized Government Agency, in effect at the time of shipment, for the supplies to be furnished under this contract. In the event prices on such supplies are decontrolled prior to the completion of deliveries hereunder and the contractor shall then increase its prices for such supplies over the maximum prices in effect at the time of decontrol, the Government may, upon writ *118 ten notice to tbe Contractor, cancel the undelivered portion of this contract; provided, however, that the Contractor may, at its option, complete all supplies in the process of manufacture on the date notice of such ■cancellation is received and deliver them to the Government 'and the Government shall accept and pay for all such supplies at the prices which were in effect at the time of decontrols.
The statement that prices were subject to adjustment to prices in effect at time of shipment was the usual agreement previously contained in all Carnegie-Illinois contracts during the price-control period. However, the provision was new which concerned the right of the defendant to cancel the contract in event of decontrol of prices and a rise in prices above those last controlled, and this provision was proposed because of anticipated decontrol of prices.
Bethlehem conditioned its bid by stating the following with respect to prices:
The prices herein stated shall be subject to adjustment to the seller’s prices in effect at the time of shipment ■but shall not exceed maximum prices established by the Office of Price Administration and in effect at time of shipment.
53. Defendant concluded that the Carnegie-Illinois bid was the more satisfactory of the two received, but was unwilling to accept the price adjustment clause set forth in that tender because the proposal would permit unlimited price rises with the only control being the undesired termination of a contract for urgently needed supplies. Accordingly, frequent and extensive negotiations were conducted between the defendant and Carnegie-Illinois concerning a price escalation clause. These negotiations were conducted by representatives of both parties with the knowledge that Carnegie-Illinois was an affiliate of United States Steel Corporation and that the price escalation problem involved many possible Navy purchases of steel products from the various divisions and subsidiaries of that company as well as from the industry in general. Both parties desired and attempted to accomplish a price escalation clause which could be used generally in future Navy contracts. The Navy representatives expressed their position that such a clause could *119 not provide for unlimited price rises because of a statutory prohibition of expenditures in excess of appropriations, and that any price escalation clause had to provide some overall limit on increases.
54. At the outset of these negotiations on July 19, 1946, Navy proposed to Carnegie-Illinois a price escalation clause to provide that within 30 days after decontrol of prices, either party could request in writing that the contract prices be redetermined by renegotiation, the redetermination to be made on the basis of the contractor’s experienced and estimated future costs, with any disagreement to be settled by usual contract procedures.
By letter dated July 24, 1946, Carnegie-Illinois advised Navy that this proposed escalation clause was not acceptable on the particular negotiation involved, insisted upon the price adjustment clause set forth in its tender, suggested re-advertisement for bids on the particular contract if the Navy desired to review the problem from an overall standpoint, requested advice as to disposition of its tender, and advised that it was to the best interest of Yards and Docks to place an order promptly as available space in mill schedules was closing rapidly.
On July 24,1946, a conference was held at the Navy Department. The Navy representatives emphasized their desire to negotiate an escalation clause mutually acceptable, to be used not only on this bid, but to serve as a pattern for all future negotiations. Carnegie-Illinois stated that the defendant’s proposed clause was unacceptable. Navy explained that the price adjustment clause in the tender was generally acceptable, but due to statutory provisions, it was imperative that some limitation on prices be set forth in the contract. Understanding that Carnegie-Illinois could not accurately predict its future costs in the event of decontrol of prices, Navy requested that Carnegie-Illinois suggest some limitation beyond which it felt its ultimate costs would not go. The Navy then proposed an amendment to the price adjustment clause in the Carnegie-Illinois tender, to limit any price increase to 120 percent of the original contract prices. The Navy representatives requested Carnegie-Illinois to accept this proposal, but indicated that if higher *120 limitation, was deemed necessary, they would consider raising tbe limitation to 140 or 150 percent of the contract prices.
55. Carnegie-Illinois declined to accept the Navy’s proposed amendment to its price adjustment clause. Thereafter a series of conferences were held between the Navy and Carnegie-Illinois concerning price escalation. On August 9, 1946, during the course of these negotiations, the Navy attempted to persuade Carnegie-Illinois to accept a letter of intent pending the outcome of escalation discussions, and on the basis thereof accord the Navy a place on its mill schedules for production of the needed piling, the Navy to have a priority of production over any subsequently executed orders placed with Carnegie-Illinois. However, Carnegie-Illinois on August 12, 1946, refused to enter into such an arrangement.
After further discussions, the Secretary of United States Steel Corporation, who had become the principal negotiator for Carnegie-Illinois, on September 18, 1946, agreed to accept a certain compromise price escalation clause with the understanding that it was limited to this particular contract. His purpose was to permit the Navy to obtain a place on Carnegie-Illinois’ production schedules. The Navy representatives likewise accepted this clause for the same reason and only for this one contract. Accordingly, on September 18,1946, Carnegie-Illinois was given oral notice that it would be awarded the contract, and on that day Navy was afforded a place on the production schedules. Thereafter, the same representatives of the parties continued to negotiate concerning a general price escalation clause for other contracts.
The compromise price escalation clause provided that in the event of decontrol of prices, Carnegie-Illinois could cancel the contract, effective ten days after giving written notice, during which period the parties were to attempt to negotiate an amendment of the contract prices.
5S. By formal notice transmitted September 27, 1946, defendant advised Carnegie-Illinois that the contract covering the pertinent steel piling had been awarded to it, and that the contract form would be forwarded for execution. The contract was later executed by both parties under that date, but *121 with amendments to the price schedules and escalation clause as hereinafter stated.
During the period of negotiations on the price escalation clause, Carnegie-Illinois’ production schedule had continued to be filled with other orders. On September 18, 1946, it submitted its revised delivery schedules to the Navy, which were incorporated in the formal contract. Instead of the delivery dates set forth in its tender, as stated in finding 51, Carnegie-Illinois then undertook to deliver the M-112 plain piling at the rate of 600 tons in February 1947, 900 tons each in March and April, and the balance of 1,061 tons in May 1947. Concerning M-113 plain piling and the special piles, it then promised delivery of 900 tons in March, 867 tons in April and the balance of 371 tons in May 1947.
By change order dated October 31, 1946, by which time the formal contract had not as yet been executed, the defendant increased the quantity of M-113 plain piles by 45 pieces, such increase being necessary to supply the quantity required for the quay wall. Defendant had been advised of this necessary increase by plaintiff’s letter dated September 6,1946, as stated in finding 44.
57. By letter dated January 7,1947, Carnegie-Illinois advised the defendant that the production of the pertinent piling was scheduled in its mills to be started during February and to be finished by June, that it had not executed and returned the formal contract due to the matter of prices, and that since the agreement had been entered into, prices had been decontrolled and the figures in the contract were no longer acceptable. It then set forth a proposed schedule of prices, which constituted an increase of 15.5 percent on all plain piling and 29.5 percent on all special piles above the prices tendered and accepted.
In the same letter, Carnegie-Illinois further stated that the escalation clause should be deleted, and that an attached price escalation provision, understood to be acceptable to the Navy, should be incorporated. This proposed clause made no reference to control of prices, but provided that the contractor was to give notice to defendant of any price increases, which would become effective if accepted by the Contracting Officer within 10 days. If not acceptable to *122 the defendant, which was to be indicated by the withholding of approval by the Contracting Officer for ten days, the contract was to be terminated, except that the contractor would have the option to deliver completed materials or those in process within an additional ten days thereafter. It was stated that the total of such increases was not to exceed 20 percent of the contract prices.
By a second change order to the contract, defendant on January 24, 1947, accepted both the schedule of increased contract prices and the revised price escalation clause, both as proposed in the Carnegie-Illinois letter. This change order provided that the formal contract when executed by the Government, together with the two change orders, would constitute the agreement between the parties. By letter dated February 4,1947, Carnegie-Illinois returned the executed contract form, together with endorsed acceptances of the change orders, to the defendant.
58. The letter of Carnegie-Illinois, dated January 7,1947, advised defendant that delivery of piles could not be completed until June 1947. The delivery schedule supplied on September 18, 1946, and included in the contract form, provided completion in May 1947. Carnegie-Illinois stated in this letter that this delay was due to a recent strike in the coal industry.
By its letter dated February 4, 1947, Carnegie-Illinois again mentioned that delivery of the last piles would be delayed one month because of the coal strike.
A strike of three weeks’ duration occurred in the coal industry in November 1946. Carnegie-Illinois actually shipped 700 tons of piling in February 1947, although it had undertaken to provide only 600 tons that month. The evidence is not sufficient to establish that this November strike delayed production and delivery of any piles for the quay wall.
Two other strikes occurred in the coal industry during the period of production and delivery of the steel piles, one for three weeks in April 1947, and one for one week in late June 1947. Both of these strikes occurred after the time within which Carnegie-Illinois proposed in its tender to complete all deliveries of piles. The evidence in this case is not sufficient to establish that coal inventories of Carnegie-Illinois *123 were reduced to the extent that delays in production resulted.
59. Although the defendant well knew from the contract drawings and specifications that the special piles were needed for the commencement and continued progress of construction of the quay wall, defendant failed to exercise reasonable diligence to require that Camegie-Illinois provide the piles in the order in which they would be required for use on the project. Although all of the delivery proposals of Camegie-Illinois indicated that the special piles would be provided last, defendant made no inquiry whether deliveries could be made in such a manner as to provide the necessary special piles as plain piles were being furnished, and Camegie-Illinois had no such contract requirements.
In late December 1946, Camegie-Illinois requested information from the defendant concerning the sequence in which defendant desired to have the piling of various lengths prepared. By letter dated January 15, 1947, defendant provided Camegie-Illinois with copies of the contract drawing of the quay wall, which showed the order in which piling of various lengths and types would be required in the construction of the quay wall, and explained that construction would commence at cell 1 and proceed in numerical order. Defendant stated generally that it would appreciate the cooperation of Carnegie-Illinois in using every means at its disposal to expedite the delivery of piles, but at no time did the defendant direct or require, by contract provision or otherwise, that Camegie-Illinois supply the piles in the order in which they would be needed for construction of the quay wall.
60. By change order dated July 3,1947, defendant required substantial additional work on the pumping plant to be located pursuant to the contract in the sand fill areas behind the quay wall. Such additional work actually ordered in the fall of 1946, included the construction of a steel sheet pile cofferdam surrounding the pumping plant and the intake pipe extending from the plant through the quay wall to the water of the bay. The agreed price of this change was $195,900, added to the contract price.
*124 A small portion of tbe steel sheet piles required for this cofferdam was purchased by plaintiff from Navy stocks. Otherwise, plaintiff purchased the required piles from Bethlehem Pacific Coast Steel Corporation. These consisted of 500 pieces, each 65-feet long, of DP-2 standard piles which are substantially similar to but stronger than the M-112 and M-113 used on the quay wall. Plaintiff placed its order with Bethlehem Pacific Coast on October 2,1946, for a price of about $50,000. Complete delivery of these piles was made between December 20, 1946, and January 31, 1947.
61. Prior to January 20,1947, the date on which a portion of the site first became available to plaintiff, plaintiff had promptly entered into subcontracts for the mechanical and electrical work, and placed orders for all other necessary materials for the performance of the contract work. Manufacture by plaintiff of the concrete piles and gunite piles for the piers had been substantially advanced. Plaintiff in July 1946 had established a field office and personnel force at the site of the work to supervise preparation for the performance of the contract.
On January 21, 1947, plaintiff started construction of the temporary access trestle to Pier No. 2 which was completed on February 10, 1947. The temporary access trestle to Pier No. 1 was started in early February and completed in early March 1947. Thereafter all of the operations required for construction of the piers and mooring platforms were performed in the proper sequence and as promptly as possible. The driving of the piles for Pier No. 1 was completed on November 20, 1947, for Pier No. 2 on November 24, 1947, and for the mooring platforms on December 8, 1947. The concrete decks for the two piers were completed on December 24,1947, and for the mooring platforms on December 30,1947. The driving of the fender piles for the two piers and the mooring platforms was completed on March 1, 1948. Because of its urgent need for berthing space for inactive vessels, the Navy began moving vessels to Pier No. 1 on January 22, 1948.
62. Independently of the delay due to unavailability of the site, the commencement of the construction of the quay wall was delayed 154 calendar days after January 20, 1947, the *125 date when the site first became available, and until June 24, 1947, when defendant first supplied sufficient piles necessary for commencement of that operation.
The contract performance time of 430 calendar days, if extended from January 20, 1947, would have required completion of all work by March 25,1948. Pursuant to plaintiff’s letter request of January 28,1947, repeated on September 4, 1947, defendant’s Officer in Charge recommended on September 19,1947, that due to unavailability of the site, plaintiff’s contract performance time be extended by 207 calendar days, being the entire period from June 27,1946, the date of plaintiff’s receipt of notice to proceed, to January 20, 1947. On the basis of his recommendation, the contract completion date would have been extended to March 25, 1948. Defendant’s Contracting Officer, however, reduced the 207 days by the 10 days considered to be necessary for assembly of labor and equipment, which preparatory time it was concluded plaintiff had had prior to availability of the site. Defendant on December 4, 1947, issued, and plaintiff accepted, a contract change order, by which plaintiff’s performance time was extended on account of unavailability of the site by 197 calendar days to March 15, 1948.
The piers and mooring platforms were substantially completed by that date. The delayed delivery of piles, however, prevented completion of the driving of the quay wall until October 29,1947, and the sand backfilling in and behind the quay wall until February 10, 1948, despite diligent operations by the plaintiff. It was then impossible to complete installation of the required facilities in and behind the quay wall by March 15, 1948, the contract completion time as extended on account of unavailability of the site.
63. Subsequent to March 15, 1948, it was necessary for plaintiff to build a substantial quantity of concrete structures and trenches on and behind the quay wall. Such work included concrete for steam trenches, electrical duct lines, manholes, bollard bases, bollard anchors, and foundations for lighting structures. The fender system on the quay wall also had to be installed, and the connections between the piers and the quay wall accomplished by construction of special expansion joints and concrete aprons.
*126 The commencement of construction of the pumphouse in the sand backfill area behind the quay wall was necessarily delayed by the prerequisite sand backfill operations until January 8, 1948, and could not be completed until June 11, 1948. The pumphouse had been extensively enlarged by changes ordered by the defendant prior to October 2, 1946. In the pertinent change order subsequently issued, defendant reasonably allowed no extension of the contract performance time on account of these changes. The enlarged pumphouse could have been completed within the contract period of 430 calendar days or on or before March 15, 1948, if there had not been delay in furnishing the steel sheet piles for the quay wall.
The work upon and behind the quay wall, as well as on the project as a whole, was substantially completed by June 15, 1948. The exceptions concerned installation of some electrical equipment and corrections of defects in portions of the work. Defendant subsequently accepted the project work as substantially completed on June 15, 1948, with minor exceptions.
64. Pursuant to plaintiff’s letter request dated June 24, 1947, repeated by its letter dated September 4, 1947, defendant’s Officer in Charge on January 12, 1948, recommended to defendant’s Contracting Officer that plaintiff’s contract performance be further extended an additional 154 calendar days, or to August 16, 1948, because of defendant’s delays in furnishing steel sheet piles for the quay wall. This proposed extension was in addition to that of 197 calendar days previously allowed for unavailability of the site, which extended the contract completion date to March 15,1948. On January 28, 1948, defendant’s Officer in Charge further advised the Contracting Officer that the contract completion date would be determined by delivery of electric motors for salt water pumps, and that the contract performance should be completed by June 15, 1948, which was 92 calendar days after March 15,1948.
By change order dated April 16, 1948, the defendant’s Contracting Officer found that due to the defendant’s delay in furnishing the steel sheet piles, the progress of the plaintiff’s work was delayed 92 calendar days, and accordingly *127 extended the contract time for completion by that number of days to and including June 15,1948.
65. The work remaining to be done after June 15, 1948, consisted of various minor corrections in the work, the installation of pump motors in the pumphouse, and resolution of a problem which had arisen concerning defects of certain previously installed electrical connections known as Burndy moles. Plaintiff had made diligent efforts to complete the project in its entirety, including clean up of the site, by June 15, 1948.
By letter to the defendant dated May 13, 1948, plaintiff advised that its mechanical subcontractor had informed plaintiff that the motors for the pumphouse were scheduled for delivery in July 1948. Installation of such motors required not more than two days.
The problem concerning the Burndy mole electrical connections became an issue when the defendant on May 26,1948, declined to accept the secondary electrical system on Pier No. 2 and the mooring platforms on the ground that such connections were defective. The Burndy moles, required to function as submersible electrical connections, were specified by defendant for use in plaintiff’s contract, as they had been in an earlier contract at the San Francisco Naval Shipyard. The installed Burndy moles had been purchased from the Burndy Engineering Company, and in fact were obtainable only from that source. In July 1947 the Burndy moles installed on the previous project had failed to function properly under water, and this problem had not beeen resolved by May 1948. The Burndy moles on the plaintiff’s project were subjected to a series of submersion tests during June 1948, with continued failure to function without leakage of current. By letter dated June 30, 1948, defendant directed plaintiff to take action to have the defects corrected. On the same date, defendant informed the Burndy Engineering Company of the failure of its moles to function properly on the present as well as the previous installation, questioned the validity of the Burndy moles, and requested that this company furnish a positive solution to the problems encountered in the present installation.
66. On July 9,1948, plaintiff had substantially completed the correction of minor deficiencies in its work and was au *128 thorized and directed by defendant to vacate its field office by July 15,1948, which, was done by the plaintiff. By letter dated July 22, 1948, defendant advised plaintiff that new moles were being provided by Bumdy Engineering Company to replace all moles previously installed, the new moles to have a revised formula for their composition and manufacture and to be thoroughly tested before shipment.
By letter dated August 4, 1948, defendant accepted the work under plaintiff’s contract as complete as of June 15, 1948, except for the installation of two pump motors for the pumphouse, two minor items of corrective work, and the Burndy mole installations. This remaining work, except for the Burndy moles, required a maximum of three days for performance.
67. The two motors for the pumphouse were eventually delivered and installed. By change order dated November 16, 1948, defendant’s Contracting Officer found that due to delays in procurement beyond the plaintiff’s control, the progress of the work on the subject contract had been delayed 126 calendar days, and accordingly extended the contract completion date to and including October 19,1948.
Ultimately plaintiff received and installed the replacement Bumdy moles, and after another series of tests, the defendant accepted the contract work as complete as of May 6,1949. By change order dated June 13,1949, defendant’s Contracting Officer directed that the contract completion date be further extended by 199 calendar days to and including May 6,1949.
68. Plaintiff’s claim for additional costs resulting from delays in furnishing the site and the necessary steel sheet piles was from time to time the subject matter of correspondence and conferences between the parties. Thereafter by speedletter dated October 9, 1947, the defendant’s Contracting Officer advised defendant’s Officer in Charge that under well-established rules of law plaintiff’s claim for damages for delays could not be administratively considered, but was within the exclusive purview of the Court of Claims, and that the contractor should be advised that this was a final decision of the Contracting Officer. By letter dated October 20, 1947, defendant’s Officer in Charge transmitted this in *129 formation to plaintiff and advised that it constituted a final decision. By letter to the Contracting Officer dated November 5,1947, plaintiff reviewed in detail the facts concerning its claim and requested reconsideration of the decision of October 20, 1947. In order to comply with the contract requirement that an appeal be taken from a final decision of the Contracting Officer within thirty days, plaintiff also appealed to the Secretary of the Navy by two letters, each dated November 18, 1947, covering respectively the claim for delay in availability of the site and the delay in furnishing steel sheet piles. By letter dated December 2, 1947, defendant’s Contracting Officer replied to plaintiff’s request for reconsideration, and stated that his decision must remain the same since plaintiff’s claims were for unliquidated damages, settlement of which was beyond his authority. He also stated that this was his final decision under Article 16 of the contract. By letter to the Secretary of the Navy dated December 30, 1947, plaintiff appealed from this last decision of the Contracting Officer.
The appeals were docketed before the Navy Board of Contract Appeals, the authorized representative of the Secretary of the Navy. Counsel for Yards and Docks then moved to dismiss the appeals because they were claims for unliquidated damages, beyond the jurisdiction of the Board. By its written decision dated November 28,1949, the Board sustained the motion in part and dismissed plaintiff’s appeals to the extent that they concerned claims for damages for delays in availability of site and furnishing by the defendant of steel sheet piles. The Board otherwise overruled the motion as it concerned plaintiff’s allegations that defendant had directed plaintiff to accelerate the work after the delays had ended. Thereafter, a hearing was held before the Board on the limited issue, and by written decision dated July 3, 1952, the Board stated that the defendant had not ordered the acceleration of the performance of plaintiff’s contract, and plaintiff’s appeals were accordingly denied. Plaintiff’s claim as presented to this Court does not include the administrative claim for additional costs for the alleged acceleration of the work.
*130 69. From all of the evidence in this case, it is found that the defendant was negligent and lacking in reasonable diligence in fulfilling its obligation to furnish the steel sheet piles for the quay wall when reasonably needed in the performance of the contract, and that as a result of such negligence and lack of diligence, plaintiff was delayed in its overall performance of the contract to the extent of 92 calendar days.
70. Defendant’s delay in furnishing the steel sheet piles caused plaintiff to incur increased cost for the salaries of its field office personnel because such employees had to remain assigned to the project for an additional 92 calendar days as a result of such delay. All of these employees were paid regular salaries regardless of the amount of work performed or the time required for the job. Plaintiff’s field office staff included the project manager, the administrative engineer, the field and office engineers, clerical workers, general outside superintendents, master mechanics and custodians. The total salary of plaintiff’s field office personnel for the period of 512 calendar days from January 21, 1947, through June 15, 1948, was $131,745.57. The average daily rate for such period was $257.32. This daily rate applied to the 92 calendar days of delay to the project produces a total of $23,673.44, which amount fairly and reasonably represents the added expense for field office salaries which plaintiff incurred as a result of the actionable delay of the defendant in furnishing the steel sheet piles for the quay wall, hereinafter referred to as the piling delay.
71. The piling delay also caused plaintiff to incur additional overhead expenses for the operation of its field office in addition to tíre salaries of its field office personnel during the 92 calendar days of delay. Such field office expenses, exclusive of salaries, included the cost of blueprints, office equipment and supplies, transportation and automobile expenses, maintenance and repair of office equipment, hauling and express for the field office, telephone, telegraph, safety engineer and first aid, light and power, and miscellaneous expenses necessary for the operation of the field office. Such field office overhead expenses were regularly continuing expenses incurred for the operation of the field office, without *131 regard to the amount of work performed or the time used in performance. The total of plaintiff’s field office expenses, other than salaries, during the 512 day's from January 21, 1947, through June 15, 1948, was $14,320.12. The average daily rate for such period was $27.97. This daily rate applied to the 92 days of delay to the project produces a total of $2,573.24, which amount fairly and reasonably represents the added field office overhead expense, other than salaries, incurred by plaintiff as a result of the piling delay.
72. The piling delay also caused paintiff to incur additional equipment ownership expense as related in this and the subsequent finding.
On January 27, 1947, plaintiff necessarily brought to the site a 20-ton Lorain truck crane, and on March 20, 1947, a D-8 caterpillar tractor with accessories. These two pieces of equipment were employed for general utility work, including the loading and hauling of material, 'and remained on the project 92 calendar days longer than would have been necessary except for the piling delay. Plaintiff had paid $12,043.75 for the D-8 caterpillar tractor and $19,722.28 for the Lorain truck crane.
The 1944 edition of the standard manual of equipment ownership expense of the Associated General Contractors, in effect at all times pertinent to this case, sets forth schedules upon the basis of which plaintiff’s additional equipment expense resulting from the piling delay can be reasonably determined. These schedules are expressed in percentages allowed for depreciation of equipment, for the expense of overhaul and major repairs, and for the costs of interest, insurance, taxes, and storage of equipment. Upon the basis of the percentages determined for such costs, the manual establishes an ownership expense per working month for each item of equipment, expressed as a percentage. This percentage of ownership expense per month is then applied, as provided in the manual, to the sum of the original purchase price of the equipment, f.o.b. factory, plus such costs as freight, assemblage and testing, and the ownership expense per working month is thus determined. Applying this monthly percentage to the prices paid by plaintiff for the equipment, plaintiff’s monthly ownership expense was *132 determined to be $698.54 per working month on the D-8 Caterpillar tractor, and $1,064 per working month on the Lorain truck crane. For the three months represented by the 92 days of delay, plaintiff’s ownership expense on a working basis would be $2,095.62 for the tractor and $3,192 for the track crane, or a total of $5,287.62, which sum is reduced by 50 percent to $2,643.81 because such equipment was idle to the accumulative extent of the delay period. The sum of $2,643.81 fairly and reasonably represents the additional ownership expense incurred by the plaintiff on these items of equipment as a result of the piling delay.
73. The piling delay also caused plaintiff to incur additional ownership expense for equipment which plaintiff held in standby until sufficient piles were furnished to enable plaintiff to commence construction of the quay wall on June 26,1947. To set and drive the steel sheet piles for the quay wall, it was necessary to use two skid piledrivers and seven piledriver hammers. Plaintiff placed such items of equipment in standby on July 11,1946, and they remained on the project in an idle status until June 26,1947.
The 5 months from January 21,1947, to June 24,1947, was the time during which plaintiff incurred additional expenses on this equipment due to the piling delay. During this time plaintiff could not rent such equipment to other parties or seek to use it on some other project because plaintiff had to be prepared to commence the quay wall operations as soon as sufficient piles had been delivered.
In determining the plaintiff’s ownership expense on this standby equipment, the same A.G.C. schedules and methods were used as described in finding 72, except that the appraised values of the equipment were used as the basis of computation. There was no evidence as to the original factory prices. Plaintiff’s acquisition costs on the seven pile-driver hammers were extremely low, being $250 each for the six smaller hammers and $500 for the large hammer. There is no evidence as to plaintiff’s acquisition costs of the two skid piledrivers.
The reasonable appraised values of the two skid piledrivers as of the year 1947, as established by the testimony of a qualified marine surveyor, were respectively $11,942.50 and $8,500. *133 The reasonable appraised values of the hammers were $1,348.29 for each of the six smaller hammers, and $1,938.37 for the large hammer.
Computed upon the basis of these appraised values, plaintiff incurred ownership expense per working month at the rate of $680.72 per month on the first skid piledriver, $484.50 per month on the second skid piledriver, $114.60 per month on each of the six smaller hammers, and $139.56 per month on the large hammer.
For the five months of standby time resulting from the piling delay, plaintiff’s ownership expense on a working basis on this equipment amounted to a total of $9,961.90, which sum is reduced 50 percent to $4,980.95 because such equipment was idle during the five months. The sum of $4,980.95 fairly and reasonably represents the additional ownership expense incurred by the plaintiff on these items of equipment as a result of the piling delay.
74. The piling delay also caused plaintiff to incur additional expenses for wage increases for the steel sheet pile-driving operation for the quay wall.
Plaintiff had properly scheduled the piledriving on the quay wall as the first item of construction, and with sufficient piles available cotdd have completed such operations within three months. Actually these operations were completed in the four-month period from June 26,1947, to October 29, 1947, despite delays during that time because of insufficient-special piles. With sufficient piles on hand to' commence operations on February 15,1947, the date when the entire site became available to the plaintiff, and with an orderly delivery of special and plain piles thereafter, plaintiff could and would have completed the driving of the quay wall substantially prior to June 1, 1947.
As a result of collective bargaining negotiations, plaintiff was required to pay various wage increases to employees who engaged in the steel sheet piledriving operation on the quay wall. These employees were piledriver foremen, piledriver men, operating engineers, apprentice engineers and mechanics. The various wage increases became effective June 1 and 23,1947, and September 1,1947. The total amount of these additional costs, which include only the amounts of the *134 increases with applicable payroll insurance and taxes thereon, was $3,268.31, which additional costs resulted from the piling delay.
75. The piling delay also caused plaintiff to incur additional general overhead expenses. The amount of general overhead expenses allocable to the present contract was established by determining the ratio between the volume of all work performed under this contract and the volume of all work performed by plaintiff after June 27, 1946, the date of receipt of notice to proceed, through June 15, 1948, the date on which such work was substantially completed, and reducing such ratio to a percentage, shown by the evidence to be 69.01 percent. This percentagé was then applied to the total of all general overhead expenses incurred by plaintiff in the period of 719 days after June 27, 1946, through June 15, 1948, in order to determine the amount of general overhead expenses allocable to the pertinent contract. The allocable amount of these expenses was then divided by the 719 days to obtain a daily rate of general overhead expense allocable to this contract, computed from the evidence to be the daily rate of $309.28. This daily rate applied to the 92 days of delay produces a total of $28,453.76, which sum fairly and reasonably represents the additional general overhead expenses incurred by plaintiff as a result of the piling delay.
76. As previously related in finding 48, plaintiff was reimbursed by defendant for the cost of fabrication of the special “X” pile installed at the comer of cells 9, 10 and 11 of the quay wall. Due to the unreasonable failure of the defendant to provide this pile when needed, plaintiff incurred additional expenses, not reimbursed by defendant, in providing additional equipment, labor and materials which would not have been necessary had this special pile been provided so that it could be driven in the normal sequence of operations. The reasonable additional costs incurred by plaintiff in driving this special pile amounted to $873.60 after deduction of a reasonable amount of cost that plaintiff would have incurred had the omitted pile been timely provided.
*135 77. The piling delay also caused plaintiff to incur additional expenses to protect the timber piles of the temporary access trestles to the piers from damage by teredos. These timber piles were driven between January 21,1947, and early March 1947. At the inboard ends of the piers where the temporary trestles crossed the site of the proposed quay wall, these timber piles were also to serve as the temporary falsework piles necessary for driving of steel sheet piling at that location.
On January 31,1947, plaintiff’s president and defendant’s Officer in Charge conferred concerning the scheduling of plaintiff’s work after the site had become available, and among other matters, discussed the driving of the falsework timber piling for the quay wall. This falsework was a temporary structure placed throughout the length of the quay wall site and used in the driving of the permanent steel sheet piling. Normally the falsework would not have been placed more than ten days in advance of the commencement and progress of the driving of the steel piles. This close sequence of the two operations was necessary because timber piles left exposed in the waters of San Francisco Bay become infested by teredos, small marine animals which bore into the wood. Teredos can destroy the structural strength of untreated timber piles within two months. At the conference, defendant’s Officer in Charge urged plaintiff to proceed with the placement of the falsework timber piles for the quay wall, and plaintiff proceeded to place a substantial amount of such falsework despite the existing uncertainties as to delivery of sufficient steel piles to commence the quay Avail operations.
In early May 1947, plaintiff pulled one of the falsework piles and found that it was badly infested with teredos. On May 15,1947, plaintiff requested and the next day defendant provided permission and instructions for the use of explosive materials, as required by shipyard regulations, to be used to destroy the teredos in the timbers. Beginning on May 26, 1947, plaintiff carried out a program of protective explosions against teredos in the quay wall falsework then existing, as well as the wooden piles of the temporary trestles to the two piers.
*136 The evidence is not sufficient to establish that defendant ordered the plaintiff to proceed with the premature installation of the quay wall falsework. Protective measures at that time would have been required for the timber piling for the temporary access trestles, even though defendant had supplied sufficient piles for commencement of the quay wall operations on February 15, 1947, because sand backfilling in and behind the quay wall could not have proceeded far enough within two or three months thereafter to eliminate the necessity for temporary protective measures against teredos in the timber piles of the temporary access trestles.
In August 1947, plaintiff was required again to take protective measures against teredos in the timber piles of the temporary access trestles, and the additional costs thus incurred were the result of the defendant’s delay in furnishing steel sheet piles 'as the sand backfilling by that time would have eliminated the necessity for any such protective measures. Between August 4 and 19, 1947, plaintiff cut temporary holes in the decking of the access trestles and dumped sand around the teredo-infested timber piles. The fair and reasonable additional costs thus incurred by plaintiff as a result of defendant’s delay in furnishing steel sheet piles amounted to $4,682.17.
78. On June 28, 1946, plaintiff entered into a subcontract with the Abbett Electric Corporation for the performance of all electrical work required by the specifications of plaintiff’s contract. This work was to be performed on the piers and mooring platforms, as well as on and behind the quay wall. In July 1946, Abbett Electric entered into purchase order agreements with suppliers to furnish the materials required for the subcontract performance, and the agreed delivery dates were from August 13, 1946, to November 16, 1946. Actual deliveries of most of the materials were made during the period from October 17, 1946, to September 8, 1947, with some deliveries in 1948. Price escalation clauses in the purchase order agreements resulted in the payment by Abbett Electric of greater prices for the materials at the actual times of delivery than would have been required at the originally agreed delivery dates. The evidence is not sufficient to establish that Abbett Electric’s suppliers could *137 have delivered the materials at dates earlier than the actual deliveries, or that these supplies could not reasonably have been accepted by Abbett Electric as soon as delivery became possible and stored for future use on the project.
79. Plaintiff’s increased costs caused by the defendant’s actionable delay in furnishing steel sheet piles, are summarized as follows:
Field Office Salaries (Finding 70)_$23,673.44
Oilier Field Office Overhead (Finding 71)_ 2,573.24
Equipment Ownership Expense (Finding 72)_ 2,643.81
Equipment Ownership Expense (Finding 73)_ 4,980.95
Wage Increases (Finding 74)- 3,268.31
General Overhead Expense (Finding 75)_ 28,453.76
Installation of Special Pile (Finding 76)_ 873.60
Prevention of teredo damages (Finding 77)_ 4,682.17
Total Increased Costs-$71,149.28
Plaintiff will be obligated to pay an additional amount of 1 percent for bond premium, or $711.49, which percentage must be paid to plaintiff’s bonding company on any amount recovered on plaintiff’s claim. Including such additional bond premium, the total of plaintiff’s additional costs is $71,860.77.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States the sum of seventy-one thousand, eight hundred sixty dollars and seventy-seven cents ($71,860.77).